KONOVER DEVELOPMENT CORPORATION *v.*
A. JAMES ZELLER
(14732)

PETERS, C. J., BORDEN, NORCOTT, KATZ and PALMER, Js.

Argued September 22, 1993—decision released January 4, 1994

*David F. Sherwood,* with whom, on the brief, was *F. Timothy McNamara,* for the appellant (defendant).

*Neil F. Murphy, Jr.,* with whom were *John L. Laudati* and, on the brief, *Lawrence J. Kiel* and *Phillip N. Walker,* for the appellee (plaintiff).

BORDEN, J. The dispositive issue in this appeal is the standard of proof required, under the circumstances

of this case, in a breach of contract action by a general partner against a limited partner. The defendant appeals[1] from the judgment, after a jury trial, in favor of the plaintiff on the complaint and on the defendant's counterclaim. The defendant claims that the trial court improperly: (1) instructed the jury on the extent of the plaintiff's fiduciary duty; (2) instructed the jury on the burden of proof by which a fiduciary must prove fair dealing; (3) admitted evidence of certain partnership expenses; (4) enforced provisions of a partnership agreement that are void as a matter of public policy; and (5) awarded prejudgment interest under both General Statutes § 52-192a and General Statutes § 37-3a. We agree with the defendant's first and second claims and therefore reverse the judgment and remand the case for a new trial.

The plaintiff, Konover Development Corporation, the general partner in a limited partnership with the defendant limited partner, A. James Zeller, brought this action claiming that the defendant had failed to pay debts according to the partnership agreement. The defendant filed a counterclaim alleging, inter alia, that the plaintiff had breached its fiduciary duty to the defendant.[2] The jury returned a verdict for the plaintiff on both the complaint and the counterclaim, and the trial court rendered judgment accordingly. This appeal followed.

The jury could reasonably have found the following facts. In April, 1986, the plaintiff and the defendant, together with Alan Temkin, executed a written agree-

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[2] The defendant's counterclaim contained five counts. The trial court directed a verdict in favor of the plaintiff on all but the third count. The defendant did not appeal from the judgment on the directed verdict on the other counts.

ment to form a limited partnership called Torringford Commercial Associates Limited Partnership (partnership). The purpose of the partnership was to merge parcels of land owned by Temkin and the defendant with four additional parcels, and construct a shopping mall in Torrington. The limited partnership agreement named the plaintiff as the general partner with a 50 percent interest, and Temkin and the defendant as limited partners with 29 percent and 21 percent interests, respectively. The agreement provided that expenses would be shared, with the general partner contributing 50 percent and the limited partners contributing 50 percent collectively. The agreement further required the limited partners to authorize, in advance and in writing, any partnership expenditures exceeding $75,000.

At the time of the partnership formation, Temkin owned a twenty-eight acre parcel of land and the defendant owned a four acre adjoining parcel. The defendant and Temkin conveyed options on their parcels to the partnership. The option on the parcel owned by Temkin provided for a purchase price of $464,00υ and expired on December 31, 1988. The partnership also acquired options on the four additional parcels needed to complete its plans, and later, it acquired an option on an additional parcel. The partnership intended to exercise its options upon the project receiving approvals by local zoning and wetlands authorities.

The project began with the advantage of a 1970 approval by the Torrington planning and zoning commission of Temkin's land for the development of a shopping center. The plaintiff's legal counsel, however, noticed a defect in the approval that required the partnership to resubmit the previous application. After the application received renewed approval, the partnership submitted to the Torrington inland wetlands and plan-

ning and zoning commissions a new application, involving all of the parcels, for approval of an enclosed shopping mall of approximately 300,000 square feet.

While the application was pending, Temkin decided to withdraw from the partnership. In February, 1988, for $1.3 million, Temkin sold the defendant his interest in the partnership and the twenty-eight acre parcel that the partnership held under option. That transaction left the defendant and the plaintiff with equal shares in the partnership.

Since the formation of the partnership, property values in Torrington had risen rapidly. As a result, a disagreement arose between the plaintiff and the defendant regarding the purchase price to be paid by the partnership for the twenty-eight acre parcel that the defendant had purchased from Temkin. The defendant wanted more than $1 million for the parcel, while the plaintiff insisted on the $464,000 option price. As an alternative, however, the plaintiff proposed that the partnership take advantage of the increased property values by exercising its options on parcels it could acquire below market value, reselling them at a profit, and then dissolving the partnership and abandoning the development plans. The defendant rejected the plaintiff's proposal.

This disagreement led to a series of negotiations between the plaintiff and the defendant that eventually culminated in the letter agreement of November 14, 1988, that gave rise to this lawsuit.[3] The letter,

---

[3] The letter agreement of November 14, 1988, portions of which were subsequently incorporated into the partnership agreement, covers five single spaced pages and includes twelve numbered paragraphs. Paragraph 1 states in pertinent part: "We [the plaintiff] agree to enter into a new option with you [the defendant] regarding this property [the twenty-eight acre parcel formerly owned by Temkin] . . . and which option shall specify a purchase price of One Million Dollars ($1,000,000)."

Paragraph 7 states in pertinent part: "KDC [the plaintiff] agrees to execute an amendment to the Agreement to provide that KDC, as Managing

written by the plaintiff and countersigned by the defendant, stated that the partnership agreed to increase the purchase price of the twenty-eight acre parcel from $464,000 to $1,000,000, but that the partnership would only exercise its option to acquire the parcels in order to go forward with the proposed mall. Furthermore, the defendant would receive a development fee of 1 percent of the total project costs, and the plaintiff would finance the project's entire carrying costs, including reimbursement to the defendant for his expenses in acquiring and carrying the optioned properties when it became necessary to execute options in the defendant's own name.

In exchange, the defendant agreed that if the plaintiff, in its sole discretion, determined that the project were no longer feasible, the defendant would reimburse the plaintiff for all of the plaintiff's "out-of-pocket" expenditures. The plaintiff would then withdraw from the partnership, leaving the defendant with a 100 percent interest in the partnership and full ownership of all real estate, permits and property rights. The letter agreement, therefore, in effect, permitted the plain-

General Partner of TCALP [the partnership], can only exercise TCALP's options on the various properties which comprise the proposed Litchfield Hills Mall project in conjunction with the development of said project, it being understood and agreed that KDC will not have the right to exercise said options solely for the purpose of effectuating a liquidation of said properties if the project is deemed by KDC to be infeasible. *In consideration of the foregoing, you agree to reimburse KDC, at such time as KDC determines in its sole discretion that the proposed project is no longer feasible, for any and all out-of-pocket expenses incurred by KDC with respect to the project . . . .*" (Emphasis added).

Paragraph 10 states: "This letter serves to document your authorization, as required by Article 3, Section 2 of the agreement, for TCALP to expend more than Seventy-Five Thousand Dollars ($75,000) in support of the project."

Paragraph 11 states: "Additionally, it is understood and agreed that Article VII, Paragraph 1 of the Partnership Agreement shall be amended to provide for a development fee of 3%, of which fee you shall receive one-third (1/3)."

tiff to terminate the partnership if it determined that the project were no longer feasible, and provided that the defendant would own all of the partnership assets and would be obligated to reimburse the plaintiff for all of its partnership expenditures.

Furthermore, the letter authorized the plaintiff to expend more than $75,000 in support of the project, purportedly in accordance with the original partnership agreement's requirement that limited partners authorize such expenditures. On August 11, 1989, by amendment to the partnership agreement, the partners formalized the essential terms of the letter agreement.

In the interim, the partnership encountered outside problems. A neighborhood group opposed the development plans and precipitated costly additional legal procedures. In addition, the partners had difficulty locating tenants interested in occupying the proposed development. Finally, in July, 1988, the inland wetlands commission issued a ruling that denied in part the partnership's application to develop the properties and significantly reduced the mall's proposed parking space. The partnership amended its plans and resubmitted them to the inland wetlands commission, but the commission's ruling on the amended plan still substantially restricted the proposed parking area.

As a result, the partners reduced the size of the proposed development. They changed the plan from a 300,000 square foot enclosed mall to a 200,000 square foot strip shopping center. They believed that the partial approval by the inland wetlands commission would accommodate the strip shopping center and that they would not be required to return to the commission for further approval. The inland wetlands commission and the planning and zoning commission, however, ordered new applications.

At that point, the plaintiff decided that the project was no longer feasible. The plaintiff determined that the cost of developing new applications, combined with carrying costs, litigation costs, delay and uncertainty, outweighed the potential benefit of completing the development. On February 7, 1990, the plaintiff advised the defendant of its decision, and on February 22, 1990, the plaintiff formally requested reimbursement for its out-of-pocket expenses according to the amended partnership agreement. The plaintiff fixed these expenses at nearly $1.1 million. The defendant did not acknowledge any debt to the plaintiff. At that time, the defendant owned all the properties that had been the subject of the partnership agreement, and the following year he entered into a contract to sell them for approximately $4.3 million.

Thereafter, the plaintiff brought this action for breach of contract, seeking recovery of the alleged debt under the partnership agreement. The defendant denied the debt and filed a counterclaim for breach of fiduciary duty. On March 5, 1992, the plaintiff filed an offer of judgment pursuant to General Statutes § 52-192a in the amount of $1 million. The defendant rejected the offer. On June 24, 1992, the jury returned a verdict for the plaintiff on both the complaint and the counterclaim, awarding damages of $1,052,663.67, plus 10 percent interest on the debt from February 22, 1990, pursuant to General Statutes § 37-3a. The trial court rendered judgment accordingly and awarded the plaintiff an additional 12 percent interest from September 19, 1990, under § 52-192a, for the defendant's rejection of the plaintiff's offer of judgment. The judgment totalled $1,571,262.42.

## I

The defendant first claims that the jury instructions did not properly impose a fiduciary duty on the plain-

tiff. Specifically, the defendant argues that the trial court charged the jury that the law required the plaintiff to act reasonably in its determination that the project was infeasible, rather than under the heightened standard imposed on a fiduciary. Furthermore, the defendant argues that the trial court improperly instructed the jury to evaluate the plaintiff's determination of the project's feasibility using a preponderance of the evidence standard. The defendant contends that as a fiduciary the plaintiff had the burden to prove by clear and convincing evidence that its determination had been made in good faith. We agree.

## A

We first dispose of the plaintiff's claims that the defendant did not preserve this issue for appeal because the defendant's request to charge the jury on the heightened standard of proof was untimely[4] and failed to comply with the form of Practice Book § 318.[5] We disagree.

---

[4] The plaintiff argues that the defendant's request to charge the jury that a fiduciary must prove fair dealing toward its beneficiary by clear and convincing evidence was untimely because it was not made until after the trial court had held the charging conference and issued its proposed instructions. This contention fails in light of the fact that the plaintiff itself filed a supplemental request to charge earlier on the same day that the defendant filed the request, and that the defendant's request was contained in his objection to the plaintiff's request. Both parties' behavior indicates that the jury instructions were actively in contention at the time the defendant filed his request on the heightened standard of proof.

[5] Practice Book § 318 provides that a written request for jury instructions shall contain "a single proposition of law clearly and concisely stated with the citation of authority . . . to which the proposition would apply." The purpose of this provision is to require parties to inform the trial court of the manner in which a rule of law applies to a particular case, rather than simply stating an abstract proposition of law. *Hall* v. *Burns,* 213 Conn. 446, 483, 569 A.2d 10 (1990). The plaintiff contends that the defendant's request for jury instructions on the clear and convincing standard of proof did not specify which facts he expected to be so proved, and were therefore inadequate under § 318. In the circumstances of this case, however, the trial court was sufficiently informed by the context of the request and

We conclude that the issue is preserved for appeal because the trial court ruled on its merits. We have granted review of issues upon which the trial court based its decision even though counsel had failed to raise the issue at trial. *Society for Savings* v. *Chestnut Estates, Inc.*, 176 Conn. 563, 568 n.2, 409 A.2d 1020 (1979). The parties presented arguments regarding the standard of proof in requests to charge, and they discussed it with the judge at the charging conference. In a motion to set aside the verdict, the defendant again argued for a heightened standard of proof. The trial court rejected the defendant's claim in a written memorandum of decision, demonstrating that it recognized the substance of the defendant's claim.[6]

## B

We next consider the defendant's claim that the jury instructions failed to impose a fiduciary duty on the plaintiff's decision to terminate the partnership because the project was no longer feasible.[7] We agree with the defendant in part.

accompanying communications to evaluate the request. The defendant's request was the last in a series of requests to charge and it followed a charging conference in which both parties and the judge had discussed jury instructions on both the fiduciary duty and the standard of proof.

[6] The trial court stated: "The question arises as to whether the defendant claims that the plaintiff must establish by clear and convincing evidence that its determination of nonfeasibility had to be made by that standard, must the jury determine by that standard that the decision was proper or both. The court charged . . . including the statement requested by the defendant, that 'a trustee in his administration of the trust is under the duty of acting exclusively and solely in the interest of the trust estate of the beneficiaries, within the terms of the trust, and is not to act in his own interest.' The court is of the opinion that its charge properly set forth the guiding legal principles for the benefit of the jury."

[7] The trial court instructed the jury on the plaintiff's fiduciary duty as follows: "It is for you to decide whether the project was feasible, as I have defined that word to you, at the time the plaintiff made its decision. It must make the decision as a fiduciary and not simply as a businessman dealing with another businessman.

"The plaintiff is a general partner and owes a fiduciary duty to its limited

The defendant argues in effect that the basic principle articulated by this court in *Dunham* v. *Dunham,*

partner. This is true since it has complete authority to deal with the partnership business.

"A fiduciary is a person holding the character of a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence involved in it and scrupulous good faith and candor which it requires. A trustee must act in good faith in the administration of the trust. And this requirement means that he must act honestly, and with the finest and undivided loyalty to the trust, not merely with that standard of honor required of men dealing at arm's length and the workaday world, but with a punctilio of honor the most sensitive.

"A trustee in his administration of the trust is under the duty of acting exclusively and solely in the interest of the trust estate or the beneficiaries, within the terms of the trust, and is not to act in his own best interest. The plaintiff claims that it no longer was required to perform because it found the project no longer feasible. Such a decision must be evaluated by you, with the understanding that the plaintiff was a fiduciary and thus owed the duty to the plaintiff that I have explained to you. . . .

"Now the term fiduciary duty, as I indicated to you, means that the partners owe one another a duty of the utmost good faith, fairness and loyalty. The courts have considered a limited number of circumstances where a general partner is in breach of its fiduciary duty to a limited partner. These circumstances have included violation of a statute, a threat of baseless litigation or assertion of a questionable claim, self-dealing by the general partner and appropriation of the partnership's business opportunities.

"*Notwithstanding the existence of a fiduciary duty as a general proposition, a general partner and limited partner can bargain for whatever terms they want in a contract so long as they are not illegal or against public policy. The exercise by the plaintiff of the contractual right it bargained for and obtained would not be a breach of its duty under the contract, provided the decision was made reasonably based upon a careful review of the relevant information the general partner had before it.*

"I am therefore instructing you that there is nothing against public policy for an agreement to give the general partner sole discretion to terminate its involvement in the project. *Here, if you find that the agreement was that the plaintiff had sole discretion to terminate the project and exercised that discretion, reasonably you would find that the plaintiff did not violate its fiduciary duty.*

"If you find, however, that Konover was incorrect in its decision that the project was not feasible, and that indeed it was feasible, then Konover could not recover on its claim and you would decide for the defendant. In other words, if you find that Konover should not have abandoned the project at the time it did, it cannot recover on its claim against the defendant and if you find so, you must find against the plaintiff." (Emphasis added.)

204 Conn. 303, 528 A.2d 1123 (1987), applies, namely, that the plaintiff, as a fiduciary with respect to the defendant, was required to prove that it made its decisions with the utmost regard for the defendant's interests. The plaintiff responds, however, that under the terms of the partnership agreement, as amended pursuant to the letter agreement of November 14, 1988; see footnote 3; the plaintiff's fiduciary duty did not extend to its decision to withdraw from the partnership. Specifically, the plaintiff argues that the partners entered into an arm's length agreement to modify their rights and obligations under the partnership agreement and that the exercise of such bargained for rights was not fiduciary in nature. Accordingly, the plaintiff argues that its determination of infeasibility and the defendant's failure to reimburse the plaintiff's expenses gave rise to an ordinary breach of contract dispute, and that, therefore, the trial court's instructions were correct.[8]

We reject both the plaintiff's and the defendant's positions. We hold, instead, that, under the circumstances of this case: (1) the plaintiff's decisions regarding the project's feasibility and withdrawal from the partnership, pursuant to the letter agreement, were impressed with a fiduciary duty; but (2) the exercise of that duty was to be viewed in light of all of the facts of the case, including (a) whether the plaintiff had made full and frank disclosure of the relevant information, (b) whether the consideration received by the defendant pursuant to the letter agreement was adequate, (c) whether the defendant had access to competent,

---

[8] The plaintiff does not contend that General Statutes § 34-17, which is part of the Connecticut Uniform Limited Partnership Act (act); see footnote 9; governs the issues in this case, except to the extent that, as the parties agree, the act reaffirms the common law principle that they were in a fiduciary relationship. We therefore have no occasion to consider the effect, if any, of the act on the question of whether the partnership agreement eliminated or diminished their fiduciary relationship.

independent advice with regard to the letter agreement, and (d) the relative degrees of sophistication and bargaining power between the parties with respect to the letter agreement.

Both parties agree that, as general and limited partners, they were bound in a fiduciary relationship. In general, partners act as trustees toward each other and toward the partnership.[9] Moreover, the general partner of a limited partnership has the fiduciary duty " 'of rendering true accounts and full information about any-

[9] General Statutes § 34-17, which is part of the Connecticut Uniform Limited Partnership Act, provides: "GENERAL POWERS AND LIABILITIES OF GENERAL PARTNERS. (a) Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership shall have all the rights and powers and be subject to all the restrictions of a partner in a partnership without limited partners.

"(b) Except as provided in this chapter, a general partner of a limited partnership shall have all the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners. Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership shall have all the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners."

General Statutes § 34-59 (1), which is part of the Connecticut Uniform Partnership Act, provides in pertinent part: "ACCOUNTING BY PARTNER. (1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

This statutory language was intended to incorporate the fiduciary relationship as described by Chief Judge Benjamin Cardozo in *Meinhard* v. *Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928): "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' or particular exceptions . . . . Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd." See generally H. Reuschlein & W. Gregory, The Law of Agency and Partnership (1990) p. 278.

thing which affects the partnership.' " *Williams* v. *Bartlett,* 189 Conn. 471, 482 n.8, 457 A.2d 290 (1983). We have stated that a "fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." (Citations omitted.) *Dunham* v. *Dunham,* supra, 322.

"Once 'a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary.' " Id. This means that the plaintiff had the burden to prove "that [it] had dealt fairly with the [defendant]." Id., 323.

The defendant argues that the jury instructions failed to extend the fiduciary relationship to the plaintiff's decision that the project was infeasible. The defendant contends that while the jury instructions recognized a general fiduciary duty, they stated that the law only required the plaintiff to act reasonably in its determination that the project was infeasible, rather than under the higher standard imposed on a fiduciary.

We review the defendant's claim in light of the established rule that jury instructions are to be read as a whole, and instructions claimed to be improper are read in the context of the entire charge. *State* v. *Castonguay,* 218 Conn. 486, 498, 590 A.2d 901 (1991). A jury charge is to be considered from the standpoint of its effect on the jury in guiding it to a correct verdict. *Ellice* v. *INA Life Ins. Co. of New York,* 208 Conn. 218, 226, 544 A.2d 623 (1988). The test to determine if a jury charge is proper is whether " 'it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Jury

instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury.' " *Kelley* v. *Bonney,* 221 Conn. 549, 584, 606 A.2d 693 (1992).

The court properly charged the jury with respect to the general principles of the fiduciary duty that the plaintiff owed to the defendant and, further, the trial court initially properly instructed the jury that the plaintiff was required to "make the decision [to terminate the partnership] as a fiduciary." See footnote 7. The trial court stated that "[t]he plaintiff is a general partner and owes a fiduciary duty to its limited partner." The court defined a fiduciary as a "trustee" who must act in "scrupulous good faith and candor." Furthermore, in accordance with the defendant's request, the trial court charged the jury with the traditional portrait of fiduciary dealings: "[The fiduciary] must act honestly, and with the finest and undivided loyalty to the trust, not merely with that standard of honor required of men dealing at arm's length and the workaday world, but with a punctilio of honor the most sensitive." This was an accurate statement of the fiduciary relationship.

We are persuaded, however, that the trial court improperly diluted the effect of its instruction when the court focused the jury's attention on the application of that duty to the plaintiff's decision to terminate the project because of the plaintiff's belief that the project was no longer feasible. The trial court unduly attenuated that duty by instructing the jury that the plaintiff complied with its fiduciary duty so long as its decision that the project was infeasible was reasonable. In particular, the court instructed: "Notwithstanding the existence of a fiduciary duty as a general proposition, a general partner and limited partner can bargain for whatever terms they want in a contract so long as

they are not illegal or against public policy. The exercise by the plaintiff of the contractual right it bargained for and obtained would not be a breach of its duty under the contract, provided the decision was made reasonably based upon a careful review of the relevant information the general partner had before it.''

By stating that the plaintiff had met its fiduciary duty simply by making the decision ''reasonably based upon a careful review of the relevant information [the plaintiff] had before it,'' the court impermissibly reduced the level of the plaintiff's duty to make its decision. The plaintiff, as a fiduciary, had the duty to deal fairly with the defendant, not simply to act reasonably based upon the relevant information. See *Dunham* v. *Dunham,* supra.

The court's instruction in effect transformed the plaintiff's fiduciary duty into the duty to make a reasonable business decision. While a decision by the plaintiff to terminate the project, reached on the basis of its fiduciary duty to the defendant, would undoubtedly have been ''reasonable,'' the converse, which the instruction necessarily implied, was not necessarily also true. That is, the duty to make a ''reasonable'' business decision based upon all the circumstances was not necessarily the equivalent of a duty to deal fairly, as a fiduciary, with the defendant.[10]

Having concluded that the trial court improperly instructed the jury regarding the plaintiff's fiduciary duty to the defendant in deciding to terminate the

[10] The court also charged: ''If you find, however, that Konover was incorrect in its decision that the project was not feasible, and that indeed it was feasible, then Konover could not recover on its claim and you would decide for the defendant.'' See footnote 9. This statement goes too far in the other direction, by suggesting that the plaintiff had the burden of proving that it was *actually correct* in its determination of feasibility. This additional misstatement adverse to the plaintiff's interest, however, does not cure the trial court's earlier misstatement adverse to the defendant's interest.

partnership, we turn to the question of the general principles that governed such a decision under the circumstances of this case. We reject the defendant's argument that the traditional principles of fiduciary duty as expressed in *Dunham* v. *Dunham,* supra, govern, because those principles do not adequately take into account the factors that are relevant to the complex commercial transaction involved in this case. We also reject the plaintiff's argument that no fiduciary principles applied to the parties' contractual provision regarding termination of their partnership, because at least under the facts of this case, in which the decision to terminate had adverse, concrete financial consequences that flowed foreseeably and directly from that decision, the plaintiff's position gives inadequate deference to the parties' preexisting fiduciary relationship. We choose, instead, a middle ground that affords an appropriate degree of flexibility and deference to the parties' contractual arrangement as well as an appropriate degree of deference to their fiduciary relationship.

With regard to the defendant's position, we recognize that the fiduciary relationship is not singular. The relationship between sophisticated partners in a business venture may differ from the relationship involving lay people who are wholly dependent upon the expertise of a fiduciary. Fiduciaries appear in a variety of forms, including agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians.[11] "[E]quity has carefully refrained from

[11] "[V]arious types of fiduciaries have evolved over the centuries. Trustees, administrators, and bailees are of ancient origin, whereas agents appeared only at the end of the eighteenth century. In the business realm, the fiduciary duties of partners, corporate directors, and officers originated with the formation of partnerships and corporations, but majority shareholders were not subjected to fiduciary duties until this century. Union leaders were cast in the fiduciary role at a still later date, when they acquired

defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations." *Harper v. Adametz,* 142 Conn. 218, 225, 113 A.2d 136 (1955). Simply classifying a party as a fiduciary inadequately characterizes the nature of the relationship.

None of the cases upon which the defendant relies involved complex commercial transactions between sophisticated parties with significant bargaining power. *Dunham* v. *Dunham,* supra, the case upon which the defendant principally relies for his description of fiduciary obligations, is factually distinct from the case at hand. In *Dunham,* one son, an attorney, had performed the family's estate planning and had drafted his mother's will, which left him substantial assets and named him executor of the estate. He then consolidated the entire family's property in his name, leaving a second son with virtually nothing. The trial court correctly instructed the jury that if it found a fiduciary relationship, the burden shifted to the attorney son to prove fair dealing. *Dunham* relies, in turn, on cases whose circumstances are also different from the case at hand.[12] Many of the cases involved disputes between

the statutory power to represent workers in negotiations with management. The twentieth century is witnessing an unprecedented expansion and development of the fiduciary law. For example, physicians and psychiatrists have recently become members of the fiduciary group, and one commentator has suggested trust law as a model for the relations between the state, parents, and children." T. Frankel, "Fiduciary Law," 71 Cal. L. Rev. 795 (1983).

[12] The cases upon which *Dunham* relies include: *Alaimo* v. *Royer,* 188 Conn. 36, 41, 448 A.2d 207 (1982) (burden shifted to real estate broker to prove fair dealing after finding that elderly disabled woman had given broker her life's savings for purposes of investment, but he had not paid interest and had spent the money); *Miller* v. *Appleby,* 183 Conn. 51, 55, 438 A.2d 811 (1981) (purchaser of home must prove by clear and convincing evidence that seller of home fraudulently misrepresented capacity of the home's septic system); *Cohen* v. *Cohen,* 182 Conn. 193, 203, 438 A.2d 55 (1980) (fiduciary relationship found between mother and son in dispute over title to family condominium); *DeLuca* v. *C. W. Blakeslee & Sons, Inc.,* 174 Conn. 535, 546, 391 A.2d 170 (1978) (private landowner has burden to prove by clear and

family members. Typically, one party had depended on the other and had been defrauded. Thus, *Dunham* does not resolve the question in this case.

The plaintiff's position, however, goes too far in the other direction. We agree with the plaintiff that, in general, the rights and duties of partners are subject to agreement between the partners. General Statutes § 34-17; see footnote 9. "It is the 'general rule . . . that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.' " (Citations omitted.) *Real Estate Listing Service, Inc.* v. *Real Estate Commissions,* 179 Conn. 128, 137, 425 A.2d 581 (1979). The parties may agree to such things as unequal or variable sharing of profits, compensation in addition to profit sharing, or different classes of partners with different rights and duties.

convincing evidence that developer who began, but did not complete, negotiations to use landowner's property as a source for landfill material fraudulently led landowner to believe contract was completed); *Hieble* v. *Hieble,* 164 Conn. 56, 61, 316 A.2d 777 (1972) (son bears burden to prove by clear and convincing evidence that he held title to family home himself rather than in constructive trust for his ailing mother); *Busker* v. *United Illuminating Co.,* 156 Conn. 456, 458–59, 242 A.2d 708 (1968) (real estate broker who would have earned commission by selling a home to adjacent power company must prove by clear and convincing evidence that power company fraudulently obtained address of homeowner by promising to deal through the broker, and then approached homeowner directly); *Creelman* v. *Rogowski,* 152 Conn. 382, 384, 207 A.2d 272 (1965) (purchaser of home must prove by clear and convincing evidence that seller of home fraudulently failed to disclose that the home, in its condition at sale, violated zoning regulations); *Basak* v. *Damutz,* 105 Conn. 378, 382–83, 135 A.2d 453 (1926) (in a family dispute over ownership of the family farm, proof that farm is owned by somebody other than holder of record title must be by clear and convincing evidence). The court in *Dunham* also referred to cases in other jurisdictions that held that conveyances of property from clients to attorneys are presumptively fraudulent and that the attorneys bear the burden to prove fair dealing by clear and convincing evidence: *Hicks* v. *Clayton,* 67 Cal. App. 3d 251, 262, 136 Cal. Rptr. 512 (1977); *Nelson* v. *Walden,* 186 So. 2d 517, 519 (Fla. App. 1966); *In Matter of Miller,* 568 S.W.2d 246, 251 (Mo. 1978).

II A. Bromberg & L. Ribstein, Partnership (1994)
§ 6.01, p. 6:4. We are not persuaded, however, by the
caselaw upon which the plaintiff relies.[13]

Furthermore, we are not convinced, as a matter of
policy, that the terms of a partnership agreement, even

---

[13] The plaintiff relies on an Illinois Appellate Court decision holding that
"when the partners have entered into an arm's length transaction in order
to effect dissolution, their relationship is not fiduciary in nature." *Hamilton* v. *Williams,* 214 Ill. App. 3d 230, 248, 573 N.E.2d 1276, cert. denied,
141 Ill. 2d 540, 580 N.E.2d 114 (1991). In *Hamilton,* however, the partnership had already been formally dissolved and the partners were in an arbitration proceeding regarding the division of partnership assets before the
incident occurred which the limited partners claimed constituted a breach
of fiduciary duty. Thus, the claimed breach occurred after their dissolution was complete and when the parties were dealing at arms length. The
plaintiff in this case, however, was still the general partner when the alleged
breach of fiduciary duty occurred. The claimed breach related to the plaintiff's decision to withdraw, not to its behavior after withdrawal.

The plaintiff also relies on *Furman* v. *Cirrito,* 828 F.2d 898 (2d Cir. 1987),
to support its contention that the terms of the agreement supersede any
fiduciary obligation. In *Furman,* the limited partners alleged that the general partners had used powers granted by the partnership agreement to
engage in a pattern of criminal wrongdoing in violation of the Racketeer
Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 through 1968
(RICO). In upholding dismissal of the action for failure to state a claim,
the Second Circuit Court of Appeals stated that "[e]ven terms [of a partnership agreement] which permit self-dealing by a partner will be enforced."
Id., 901. The dispositive issue, however, was the plaintiffs' failure to allege
facts of a pattern of criminal activity sufficient to create liability under RICO,
not the interpretation of the agreement.

Moreover, in making the claim about self-dealing in partnerships, the court
relied on *Riviera Congress Associates* v. *Yassky,* 18 N.Y.2d 540, 548, 223
N.E.2d 876 (1966), for its authority. *Riviera Congress Associates* is often
cited for the "anything goes" position toward partnership agreements, but
the propriety of its use in this regard is debatable. D. Reynolds, "Loyalty
and the Limited Partnership," 34 Kan. L. Rev. 1, 28 (1985); *Furman* v.
*Cirrito,* supra, 905 (Pratt, J., dissenting). *Riviera Congress Associates* was
a victory for the limited partners in their suit against general partners for
claimed self-dealing. The court in *Riviera Congress Associates* concluded
that provisions authorizing self-dealing were not ipso facto impermissible,
but remanded the case for a determination of whether the general partners in that case had acted in good faith. The court also reaffirmed the
principle that general and limited partners are bound in a fiduciary relationship. *Riviera Congress Associates* v. *Yassky,* supra, 547, 548.

given due deference to the provisions of freedom of contract, necessarily negate the fiduciary relationship that inheres in the partnership. At the least, such a requirement is inappropriate in circumstances such as these, in which the termination by the general partner will inevitably result in substantial financial obligations from the limited to the general partner. In such circumstances the better course is to maintain the fiduciary relationship, but to make clear that, in determining whether the general partner has dealt fairly with the limited partner, the factfinder should take into account all of the circumstances surrounding their business relationship.

This position is consistent with the conclusions reached by other courts, which have likewise held that the terms of a limited partnership agreement cannot negate the fiduciary duty. See, e.g., *Wartski* v. *Bedford,* 926 F.2d 11 (1st Cir. 1991) (fiduciary duty of partners is integral part of partnership agreement, whether or not expressly set forth therein, and cannot be negated by partnership agreement); *Labovitz* v. *Dolan,* 189 Ill. App. 3d 403, 406, 545 N.E.2d 304, cert. denied, 129 Ill. 2d 564, 550 N.E.2d 557 (1990) (general partner had breached its fiduciary duty because duty existed concurrently with obligations set forth in partnership agreement and could not be destroyed by agreement that gave general partner "sole discretion" over "availability of Cash Flow for distribution to partners").

Commentators have acknowledged that the fiduciary relationship in a commercial limited partnership may differ from other fiduciary relationships. "Categorical prohibitions of conflicting interests might be a coherent response [to problems of divergent interests endemic to the limited partnership form] . . . but a potentially fatal one as well for whatever assumed benefits of flexibility in capital formation the form provides. Categorical permission for conflicting interests might

also be a coherent response, but one running all the risks that 'fiduciary ideology' is supposed to prevent. What is desired is a scheme for containing conflicts, a fairness-promoting regime that ensures, to the extent possible, that investors in the limited partnership are not being exploited, overreached, or taken advantage of by the managers of their money." (Citations omitted; internal quotation marks omitted.) D. Reynolds, "Loyalty and the Limited Partnership," 34 Kan. L. Rev. 1, 26 (1985); see also II A. Bromberg & L. Ribstein, supra, § 6.07, p. 6:70 (arguing for more flexible application of rules of fiduciary duty to commercial partnerships based upon availability of "extrajudicial controls, including joint management by the partners, the relatively equal expertise of the partners, the terminability of the relationship, and the alignment of incentives of the partners through profit sharing and personal liability for partnership debts").

We agree with the thrust of these commentaries that, in general, in the context of a commercial limited partnership the fiduciary relationship must be flexible enough to ensure that partners with diverse interests will be able to craft and rely on a partnership agreement that reflects their common interests. The law should recognize that an overly strict interpretation of partnership loyalty might stifle the limited partnership form, and enable a limited partner to exploit its status as beneficiary to hold a general partner hostage to the partnership. See II A. Bromberg & L. Ribstein, supra, § 7.01, p. 7:10. We also recognize, however, that an active general partner may use its position in the partnership for its advantage at the expense of a passive limited partner, and that, therefore, wise public policy counsels the retention of the fiduciary principle. We must search for a balance between flexibility and fidelity.

The courts of Illinois have developed a framework, which we endorse, that accommodates this need for balance. In *Brown* v. *Commercial National Bank of Peoria,* 42 Ill. 2d 365, 247 N.E.2d 894, cert. denied, 396 U.S. 961, 90 S. Ct. 436, 24 L. Ed. 2d 425 (1969), reh. denied, 396 U.S. 1047, 90 S. Ct. 680, 24 L. Ed. 2d 693 (1970), the Supreme Court of Illinois held that, in the context of a claim that a bank had breached its fiduciary duty in dealings with a financially sophisticated beneficiary, the fiduciary's responsibility to establish that the transaction was fair was to be considered in light of all the circumstances. "Important factors in determining whether a particular transaction is fair include a showing by the fiduciary: (1) that he made a free and frank disclosure of all the relevant information he had; (2) that the consideration was adequate; and (3) that the principal had competent and independent advice before completing that transaction." (Internal quotation marks omitted.) Id., 369. We make explicit an additional factor that the Illinois court implicitly included in its analysis: (4) the relative sophistication and bargaining power among the parties.

This framework retains the principle of fiduciary honor, but also reflects the many different kinds of parties that enter into fiduciary relationships by requiring, in the calculus of the factors that constitute fair dealing, consideration of the nature of the relationship between the parties. It protects passive investors while preserving the flexibility required in commercial relationships. The trial court's instructions to the jury did not reflect this analysis, and a new trial is therefore required.

C

We also agree with the defendant's claim that the trial court improperly instructed the jury to evaluate the plaintiff's determination of the project's feasibil-

ity by a preponderance of the evidence standard.[14] The defendant contends that the plaintiff, as a fiduciary, bore the burden to prove by clear and convincing evidence that it made its decision in good faith.

Proof of a fiduciary relationship imposes a twofold burden on the fiduciary. First, the burden of proof shifts to the fiduciary; and second, the standard of proof is clear and convincing evidence. "Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Further-

---

[14] The trial court instructed the jury on the burden of proof as follows: "In this civil case, the plaintiff must prove the allegations of its complaint by a fair preponderance of the evidence and the defendant must prove the counterclaim by a fair preponderance of the evidence. The party having the burden of proof on the complaint or counterclaim must prove it by the better and weightier evidence.

"You will take all the evidence that is offered and consider the various circumstances which are involved. You will weigh it and balance it, and then if you find the evidence fairly preponderates in favor of the plaintiff or the defendant, as the case may be, that party will have proved a particular issue you have before you.

"If on the other hand it does not fairly preponderate in its favor, if the better and weightier evidence does not seem to you to establish its position, then the party having the burden would have failed in its duty to prove to you the facts upon which it relies.

"In case it happens that the evidence is equally balanced so you cannot say it inclines this way or that way, then on the issue in question, your decision must be against the party who has the burden because it is for that party to prove it, and not the defendant nor the plaintiff as the case may be to disprove it. . . .

"Proof by a fair preponderance of the evidence is the burden of proof that the plaintiff or the defendant must prove. It is your right to draw inferences from the facts which you have found to be proven. You may find the facts that are more likely so than not from direct or eyewitness testimony. You can also find the facts that are more likely so from indirect evidence or circumstantial evidence, that is, a chain of circumstances pointing to the existence of certain facts.

"In civil cases, an inference need not be so conclusive as to exclude every other hypothesis. The test is whether the evidence, fairly and impartially considered, is likely to induce in the minds of jurors of ordinary intelligence, attentively considering it and using common sense, a reasonable belief that it is more probable than not that the fact that [is] in issue is true."

more, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." (Citations omitted; internal quotation marks omitted.) *Dunham* v. *Dunham,* supra, 322–23; *Oakhill Associates* v. *D'Amato,* 30 Conn. App. 356, 358, 620 A.2d 1294, cert. granted, 225 Conn. 926, 625 A.2d 826 (1993).

The jury instructions in this case replaced the plaintiff's burden to prove fair dealing by clear and convincing evidence with the ordinary civil standard of proof by charging that "the plaintiff must prove the allegations of its complaint by a fair preponderance of the evidence . . . . The party having the burden of proof on the complaint or counterclaim must prove it by the better and weightier evidence." The court then defined "fair preponderance" of evidence as that which induces a "reasonable belief that it is more probable than not that the fact that [is] in issue is true." Upon retrial, the court should instruct the jury on the burden of proof in accordance with the rule of *Dunham* v. *Dunham,* supra.[15]

## II

The defendant further claims that certain provisions of the partnership agreement are unenforceable as against public policy.[16] In particular, the defendant

[15] The plaintiff contends that this error was harmless. Because a new trial is required due to our conclusion regarding fiduciary duty, we need not address the harmfulness of the error in the charge on burden of proof.

[16] Although our conclusions in part I of the opinion are dispositive of this appeal, we address the claims in parts II and III because they are likely to arise in the retrial. Because we must remand the case for a new trial, we need not consider the question of whether the trial court improperly awarded 10 percent prejudgment interest on the debt pursuant to General Statutes § 37-3a, in addition to 12 percent interest on the plaintiff's rejected settlement offer pursuant to General Statutes § 52-192a.

claims that the terms of the agreement permitting the plaintiff to withdraw from the partnership and receive reimbursement for its expenses if, in its sole discretion, it determined that the project were infeasible, cannot be enforced because they permitted the general partner to manipulate the partnership to its own advantage.

This court has refused to enforce contract provisions that violate public policy. *Smith* v. *Crockett Co.,* 85 Conn. 282, 287, 82 A. 569 (1912); *McCarthy* v. *Santangelo,* 137 Conn. 410, 412, 78 A.2d 240 (1951). We are not persuaded, however, that this partnership agreement, which granted the general partner sole discretion to determine the feasibility of continuing the enterprise, violated public policy. A provision of a partnership agreement does not violate public policy simply because it is susceptible of an application that is advantageous to one partner and disadvantageous to another. The defendant has failed to advance any cogent reason to persuade us otherwise.

### III

The defendant next contends that the trial court improperly admitted certain evidence without a proper foundation. Specifically, he challenges the admission into evidence, over his objection, of partnership expenses totalling approximately $1 million for which the plaintiff seeks reimbursement under the terms of the November 14, 1988 letter agreement. The defendant contends that he did not approve the expenses and that, under the terms of the partnership requiring preapproval by limited partners of expenses in excess of $75,000,[17] the expenditures cannot be recovered because they should never have been made. We disagree with the defendant's claims.

---

[17] Article III (2) (c) of the limited partnership agreement provides: "All expenses incurred by the Partnership prior to the acquisition of the Property exceeding an aggregate of Seventy-Five Thousand ($75,000.00) Dol-

The evidence at issue consisted of the plaintiff's receipts for expenses such as option payments, legal fees, and architect and engineering fees. The defendant objected to the admission of the evidence at trial and thus properly preserved the issue for appeal. The trial court overruled the defendant's objection at trial and reaffirmed its decision on admissibility in its written memorandum of decision on the defendant's motion to set aside the verdict.

The trial court has broad discretion to determine the admissibility of evidence and its rulings will not be disturbed on appeal absent an abuse of that discretion. *Hall* v. *Burns,* 213 Conn. 446, 451, 569 A.2d 10 (1990). The trial court in this case did not abuse its discretion by admitting evidence of the partnership expenditures. The court based its decision on the authorization in the November 14, 1988 letter agreement signed by both the plaintiff and the defendant. Paragraph 10 of the letter agreement states: "This letter serves to document your authorization, as required by Article 3, Section 2 of the agreement, for TCALP to expend more than Seventy-Five Thousand Dollars ($75,000) in support of the project." See footnote 3. The trial court properly concluded that this paragraph eliminated the requirement of prior approval of expenditures exceeding $75,000 contained in the original partnership agreement.

lars shall be made only upon the prior written approval of the majority of the ownership interests of the Partnership and shall be paid by funds furnished by the General Partner through the Partnership bank account(s) established in accordance with the terms of Article XIII, [of the agreement] provided however, said payment(s) shall be deemed to be a loan from the General Partner to the Partnership as evidenced by a demand promissory note or notes from the Partnership in favor of the General Partner and bearing interest as of the date of each note, at the prime interest rate of The Connecticut Bank and Trust Company, N.A. as of said date plus one (1%) percent, to the date of payment of each note by the Partnership."

The defendant asserts that the letter agreement retroactively approved expenditures exceeding $75,000 that the partnership had made prior to the date of its signing, but it did not authorize subsequent expenditures. The letter does not state, however, that it only ratified prior expenditures, and we decline the defendant's invitation to read that meaning into it. The letter simply stated that it authorized expenditures exceeding $75,000 in support of the project. Where the parties have reduced their agreement to a writing, we have stated that "the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *Tomlinson* v. *Board of Education,* 226 Conn. 704, 722, 629 A.2d 333 (1993). The defendant was knowledgeable about the partnership's activities, and was fully aware that after November, 1988, the partnership expended far more than $75,000 on its essential costs. There is no indication that he objected to the expenditures at the time they were made. The trial court did not abuse its discretion by treating the letter agreement as a contract and interpreting it so as to approve subsequent expenditures exceeding $75,000.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.