[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Before the court in this proceeding, in which the plaintiffs seek a temporary injunction, is the issue whether a partner in a partnership formed to develop and operate a real estate project CT Page 514 may pursue its individual advantage under the provisions of the partnership agreement to the disadvantage of the partnership and its partner.
The plaintiffs, Fusco-Long Wharf Associates Limited Partnership and Edmund J. Fusco (collectively, "Fusco") seek a temporary injunction requiring the defendants, SNET Real Estate, Inc., SNET Real Estate Development Corp. ("SNET partners") to renew an existing loan guarantee during the pendency of this action. The complaint alleges that the SNET partners are engaged in an effort to force the Fusco partners out of the partnership by creating an unnecessary call for thereto contribute approximately $4 million of capital in the hope of triggering a dilution of the Fusco partnership interest. The plaintiffs assert that the SNET partners' announced refusal to renew a guarantee of an unsecured note to People's Bank when it comes due at the end of January 1994 is part of a predatory action against the partnership and that the Fusco partners will suffer irreparable injury for which they have no remedy at law unless temporary injunctive relief is ordered requiring the extension of the loan guarantee by the SNET partners.
The real estate project at issue is the Long Wharf Maritime Center in New Haven, which consists of two high rise office towers, a parking garage, a warehouse and restaurant. Divisions of SNET and Fusco Corporation, of which plaintiff Edmund J. Fusco is a principal, are major tenants of the Long Wharf Maritime Center, which is Class A office space and which enjoys a high occupancy rate and above-market rental rates.
The initial partnership agreement was signed in January 1985.[1]
By the terms of the agreement, Fusco and the SNET partners were equal partners, and Fusco was the managing partner.
During the construction of each of the buildings in the Long Wharf Maritime Center complex, the partnership pursued the agreed course of financing almost all of the cost of the project through loans, with minimal capital contributions by the partners.[2]
In 1986-7, in addition to various secured loans, the partnership entered into an unsecured commercial loan with People's Bank in the amount of $4 million. The SNET partners guaranteed half the loan and the Fusco partners guaranteed half the loan, that is, the guarantees were proportional, not joint and several. The People's loan was later increased to $7 million, CT Page 515 with no change in the terms of the guarantees, which remained proportional.
In 1990, the partnership sought to increase the loan to $9 million to finance the construction of a cafeteria and day care center for the Long Wharf Maritime Center complex. At that time, People's asked that the partners enter into joint and several guarantees of the $2 million addition to the prior obligation.
During 1990 and 1991 the managing partner sought to refinance the entire debt structure of the complex including the debt to People's, but was unsuccessful because of the general reluctance of lenders to finance office buildings in New England, which had become overbuilt during the 1980's.
When the People's note matured on December 31, 1991, People's was willing to extend the loan. The SNET partners, through Barbara Hampton, took the position that they would not extend the joint and several guarantees of this obligation unless the Fusco partners agreed to changes in the partnership agreement. The amended partnership agreement was signed on January 30, 1992.
The amended agreement, to which the parties are SNET Real Estate, Inc. and SNET Real Estate Development Corporation, (who together have a 50% interest in the partnership known as Long Wharf Development Associates) and Fusco-Long Wharf Associates Limited Partnership and Edmund J. Fusco (who together have a 50% interest in the partnership) continues to provide for financing in preference to capitalization by the partners. Article 3.04(a)(1) provides that "prior to requiring any Additional Capital Contribution by the Partners, the Partnership shall first use its best efforts to secure such needed capital by way of borrowings from banks or others subject to the approval of such borrowings by each partner as required [sic] in Section 5.01(c)(4)." The cited provision states, inter alia, that "[n]o Partner shall be required to provide any guarantee, comfort letter or other credit enhancement in connection with any Partnership loan. . . ."
Section 3.04(c) of the amended partnership agreement further provides that if the partnership encounters the necessity for additional capital contributions and one partner fails to pay its proportional share, the partner that does make payment may, at its option, take one of the following steps: sue the noncontributing partner for its share, treat the unpaid share as CT Page 516 a loan, reduce the percentage of the noncontributing partner's holding in the partnership to correspond to its new proportion of contribution, or treat the failure as a withdrawal from the partnership, with a five-year payout of the interest of the noncontributing partner.
The People's loan was extended first to December 31, 1993 and then to January 31, 1994, with both the Fusco Partners and the SNET partners affirming their joint and several guarantees.
People's is willing to extend the loan, in an amount reduced by payments of principal that the partnership has made in addition to all its interest payments, through 1995, provided the SNET partners continue to guarantee the entire amount. The SNET partners take the position that they will not their extend their obligation on those terms because to do so would put them in the position of bearing more risk than the Fusco partners. They claim that if the project does not generate sufficient revenue to keep current with the debt and other obligations of the partnership, the Fusco partners may not be able to pay their equal share of needed contributions to make up the shortfall, and People's would then look to the SNET partners, who have greater liquid assets, to pay more than half of the obligation. The SNET partners take the position that the partners should pay the obligation to People's at the end of January 1994.
The Fusco partners take the position that the partnership agreement states the goal of financing the property by borrowing, not by infusing the partners' capital into it, and that the SNET partners have a duty pursuant to 3.04(a)(1) to use their "best efforts" to obtain financing by extending the People's loan on the same terms which have been in effect since 1991.
The Fusco partners contend that the SNET partners have a duty to the partnership to achieve extension of the People's loan and that they are breaching their duties to the partnership and their partners by, instead, taking advantage of their superior liquidity to create a situation that will force a dilution of the Fusco partners' interest by creating a need for capital to pay off the obligation to People's rather than extending that debt.
The SNET partners argue that their duties to the partnership and to their partners do not include taking on a greater share of the risk than 50%, and that furnishing a guarantee as to the entire obligation to People's for an additional term would put CT Page 517 them in a position of disproportionate risk in what was to be an equal venture. They claim that their obligation to the partnership is limited by 5.01(c)(4) of the amended partnership agreement, and that they need not use their "best efforts" to borrow if the furnishing of a joint and several guarantee is part of the terms. They further argue that they may be guided by their obligations to their shareholders in preference to their partnership obligations.
The Fusco partners take the position that since the SNET partners had already agreed to provide the guarantee to People's when that portion of the partnership debt was extended on December 31, 1991, 5.01(c)(4) of the partnership agreement cannot be read to apply to the renewal or continuation of that guarantee, but can be invoked only as to other financing arising after amendment of the agreement.
Standard for Injunctive Relief
A party seeking a temporary injunction to preserve the status quo until the rights of the parties can be determined after a full hearing on the merits must establish a reasonable degree of probability that it will ultimately succeed on the merits and that denial of such relief may result in greater harm to the plaintiff than will result to the defendant from granting relief. Griffin Hospital v. Commission on Hospital and Health Care,196 Conn. 451, 457 (1985), citing Olcott v. Pendleton, 128 Conn. 292,295 (1941).
A. Probability of success on the merits
The defendants have raised a number of objections to the relief sought. It is useful to consider first the plaintiffs' likelihood of success on the merits as to their claim that the defendants are required to put the welfare and goals of the partnership above their own advantage.
While the appellate courts of this state have touched on the issue of the obligations of partners to each other and to the partnership before, see, e.g., Williams v. Bartlett, 189 Conn. 471,482, appeal dismissed, 464 U.S. 801 (1983), only very recently has the Connecticut Supreme Court specifically considered in detail the obligations of partners in a partnership in which the partners hold equal shares. In Konover Development Corporation v. Zeller, 228 Conn. 206 (January 4, 1993), the CT Page 518 plaintiff, the general partner in a limited partnership, sued a limited partner who had accumulated a fifty percent interest. The partnership agreement provided, in essence, that if the plaintiff determined that the real estate development project that the partnership had been pursuing was no longer feasible, the plaintiff could withdraw from the partnership, leaving the defendant with full ownership of the land being developed, and that the defendant must then reimburse the plaintiff for the costs spent on attempting development. The plaintiff alleged that the defendant had failed to pay the expended costs in accordance with the partnership agreement. The defendant counterclaimed, alleging that the plaintiff had breached its fiduciary duty in determining that the development was no longer feasible.
The Supreme Court noted that a partnership binds the parties in a fiduciary relationship, 228 Conn. at 218, but recognized that all fiduciary relationships are not alike:
 The relationship between sophisticated partners in a business venture may differ form the relationship involving lay people who are wholly dependent upon the expertise of a fiduciary . . ." [E]quity has carefully refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations." Harper v. Adametz, 142 Conn. 218, 225, 113 A.2d 136 (1955). Simply classifying a party as a fiduciary inadequately characterizes the nature of the relationship.
228 Conn. at 222-223.
In the context of complex commercial transactions between sophisticated parties with significant bargaining power, the Court stated, 228 Conn. at 223, that neither the high standard of fiduciary protection required in Dunham v. Dunham, 204 Conn. 303,528 A.2d 1123 (1987) nor a mere arm's length contractual posture applied:
 [W]e choose, instead, a middle ground that affords an appropriate degree of flexibility and deference to the parties' contractual arrangement as well as an appropriate degree CT Page 519 of deference to their fiduciary relationship.
Clearly, in negotiating the terms of a partnership agreement, sophisticated business partners act at arm's length to achieve favorable positions and rights for themselves, and equally clearly, once a partnership has been formed, the partners are required to act for the benefit of the partnership rather than to continue to pursue their individual advantage. In Konover, the Connecticut Supreme Court allied itself with those authorities that favor an approach that enhances the stability of the partnership relationship: ". . . in the context of a commercial limited partnership the fiduciary relationship must be flexible enough to ensure that partners with diverse interests will be able to craft and rely on a partnership agreement that reflects their common interests . . . [W]e must search for a balance between flexibility and fidelity." 228 Conn. at 227.
In addition to the clarification of a general approach, the application of that approach in Konover provides considerable guidance to this court because the issue in that case was whether a factual determination made solely by one partner, with consequences for the other partner, was made with the degree of good faith owed by a fiduciary. The trial court had to determine whether the development was actually not feasible at the time the plaintiff so declared. Latent was the issue whether the general partner was putting its own interest in recovering its costs over the partnership's interest in pursuing the development project. In the situation before this court, the issue is similar: the good faith of an interpretation of one partner of a protection under the agreement, when that determination may injure the other partner.
The defendants suggest that their fiduciary duties as partners can be no greater than their obligation under the partnership agreement, and that they may invoke 5.01(c)(4) to defeat the agreement to use "best efforts" to finance through borrowing.
In Konover, the Connecticut Supreme Court cited with approval cases in which a partner accused of breach of a fiduciary duty to the partnership relied on a provision of the partnership agreement and indicated its agreement with the conclusion in these cases that "the terms of a limited partnership agreement cannot negate the fiduciary duty." 228 Conn. at 226. CT Page 520
On the basis of this guidance, this court concludes that the SNET partners have a duty not to interpret or invoke Article 5.01(c)(4) in a way that would be unnecessarily harmful to their partners unless there is a clear showing that such an interpretation is necessary to protect the defendants from burdens not contemplated by the scope of the partnership.
The SNET partners had in 1991 affirmed a joint and several guarantee of the entire People's loan (Ex. F), just as the Fusco partners had, and this guarantee was in effect at the time the partnership agreement was amended. The court does not find credible the claim that they advised the Fusco partners at that time that they would never extend that particular guarantee if other financing were not obtained. Since the record reveals that the SNET partners were given to punctilious documentation, and even claimed to find it necessary to create a documentary record as to events certainly known to the Fusco partners (See, e.g. Ex. L), the court concludes that no such statement was made by the SNET partners until it became clear that the refinancing of the entire debt was not going to be achieved, and that an opportunity existed to force out or dilute the interest of the Fusco partners. Only at that point did the SNET partners contend that the People's guarantee was also subject to 5.01(c)(4).
The lack of necessity of the position of the SNET partners is critical. Since the partnership agreement reveals an intention to bear equal risks, see 5.07 of the amended partnership agreement, the SNET partners could not be said to be invoking Article 5.01(c)(4) in violation of their fiduciary duty to the partnership if the situation were such that the furnishing of a joint and several guarantee clearly exposed them to the prospect of bearing an unequal liability or risk.
Projections offered by the plaintiffs indicate, however, that at least as to 1994, the revenues of the project are likely to be sufficient to cover all debt, including a renewed loan from People's and the reduction of the principal of that loan. The financial statements of the Fusco partners likewise reveal an ability to cover a substantial amount of any shortfall that might occur if the projections for 1994 prove to be overly optimistic. The burden of proof upon an allegation of breach of fiduciary duty shifts to the fiduciary, who must show fair dealing "either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence". Konover CT Page 521 Development Corp. v. Zeller, 228 Conn. at 206, quoting Dunham v. Dunham, supra 322-23; Oakhill Associates v. D'Amato, 30 Conn. App. 356,358, 620 A.2d 1294, cert. granted, 225 Conn. 926,625 A.2d 826 (1993).
In answer to the plaintiffs' claim of breach of fiduciary obligation, the defendants have provided no clear and convincing proof as to their claim that they would, during the proposed extension of the People's loan, be put in the situation of bearing more than half the risk and liability of the partnership. At trial they offered no projections to refute the plaintiff's proof that there was little chance of default on any of the partnership obligations for the two year period at issue, but relied on unsupported pessimism as to the rise of the prime interest rate, (to which some of the partnership debit is pegged) and the possibility of unexpected capital requirements. The present ability of the project to command above-market rents and the fact that a substantial portion of the leased area is subject to long term leases weigh against the defendant's professed fears. Though the defendants presented evidence as to a decrease in the value of the complex, the relevant inquiry is, instead, the likelihood that its revenues would cover the payment due on the debt, including the renewed People's debt, during the pendency of this action. It is undisputed that the partnership has never failed to make a payment on any loan, and the only financial projections supplied indicate a modest surplus for the relevant period, based on a reasonably stable revenue situation.
The sincerity of the defendants' claimed fear of exposure to disproportionate risk is very much open to question. Since 1989, the defendants have on other occasions, notably in relation to an obligation to the Bank of Boston that came due, tried to create financing crises that would force the Fusco partners to produce large amounts of cash despite the availability of financing. They have announced in their annual report a strategy of trying to acquire a greater interest in the Long Wharf Maritime Center, virtually a public announcement of a hostile posture toward their partners.[3]
Under the present circumstances, the plaintiffs have demonstrated a sufficiently strong likelihood of success on the merits of their claim of breach of fiduciary duty by the unwarranted invocation of Article 5.01(c)(4) to the detriment of the Fusco partners. CT Page 522
B. Balancing of harms
Without temporary injunctive relief, the plaintiffs would suffer an injury to their right to receive the benefits of fiduciary performance from their partners, and continuation of the present partnership relationship. They have also demonstrated a likelihood that they may suffer an injury to their interest in continuing as equal partners in a complex that is the flagship of the Fusco business ventures, since the defendants have indicated their intention to force an unnecessary, large capital contribution or use the failure to contribute as grounds for diluting the Fusco partners' interest in the partnership.
The harm to the defendants from the granting of temporary relief is minor or nonexistent. If the partnership did not extend the People's loan because of the defendants' refusal, the partners would have to pay the full indebtedness. If the Fusco partners were to fail to make their half of the payment, as the SNET partners claim to fear, then the SNET partners would have to pay it, a situation less favorable to them than the status quo, since partnership revenue is now meeting the indebtedness, with no out-of-pocket contributions by the defendants. (The court does not, of course, weigh any advantage to the defendants from the success of a strategy of creating an artificial need for capital in order to enhance their share of the partnership, having found this to be inequitable and inconsistent with the defendants' fiduciary duties).
The harm from denial of relief is far greater than the harm that could result from granting it.
C. Mandatory nature of the relief
The defendants object that the plaintiff is not requesting the preservation of the status quo, but rather an alteration of it and an order requiring the creation of a new situation, not the preservation of the existing situation.
In the past, Connecticut courts had appeared to disfavor the issuance of temporary injunctions requiring a defendant to complete affirmative acts rather than merely prohibiting the defendant from engaging in acts. See Stamford v. Kovac, 29 Conn. App. 105,109-110 (1992). Reviewing the ruling of the Appellate Court in Stamford v. Kovac, 228 Conn. 95, 100-101 (1993), the Supreme Court rejected the view that mandatory relief is CT Page 523 available only after a hearing on the merits and not in connection with a temporary injunction and held that such relief may be appropriate if "the status quo is a condition not of rest, but of action . . ." In such cases, the Court noted, courts of equity may issue mandatory injunctions before the case is heard on the merits.
In order to preserve the equal partnership and the policy of financing set forth in Article 3.04(a)(i) of the partnership agreement that is a basic provision of this venture between partners with unequal assets, it is necessary to require the defendants to continue to take advantage of the availability of renewal of the People's loan on terms that have not been shown to create a situation of unequal risk to them for the period until a full hearing can be held on the plaintiffs' claims.
Absent an order to take the steps necessary to extend the People's loan, the harm which the plaintiffs seek to avoid would be fully or partly complete by the time the case can be heard on the merits.
Conclusion
The plaintiffs have established entitlement to temporary injunctive relief.
The defendant partners, their agents, servants, officers and employees are therefore hereby enjoined from failing and refusing to extend the partnership loan from People's Bank in the amount of the partnership's present indebtedness on the offered terms' until the first of the following events: the maturation of the extended obligation on December 31, 1995, adjudication of the plaintiffs' claims on the merits; further order of the court. The defendants are further enjoined to do all things necessary to complete such extension and to refrain from interfering with the availability of such extended financing.
Beverly J. Hodgson, Judge