[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal of a probate court proceeding awarding fees to the appellee, Malcolm Barlow. As such it is a trial de novo. The appellants are beneficiaries of trusts for which the appellee was trustee.
The appellants' reasons for the appeal are as follows: 1) they believe that the trusts were overcharged for legal services by the former trustee Malcolm Barlow; 2) they believe that their interests in their estates have been unduly burdened by payment for services rendered by Malcolm Barlow as escrow agent for all parties to a complex commercial litigation in which the trusts had only a minority interest; 3) they believe that it was erroneous, improper, unfair and unreasonable for the trustees to be charged for time spent by Malcolm Barlow as escrow agent subsequent to his resignation as trustee on September 24, 1992; that he was no longer entitled to fees as trustee, having resigned as such and had not claimed any of these fees in the final accounts filed on June 11, 1992, nor did he amend the final accounts subsequent thereto.
The facts of this case are as follows. In 1987 five inter CT Page 6682 vivos trusts were created by Jerome Baskin for the benefit of his wife and two children. The appellee Malcolm Barlow became the successor trustee on June 3, 1986. The principal asset of the trusts was an interest in the Silk Mill Associates Limited Partnership. Jerome Baskin and David Woodbury in the early 1980s purchased a mill building in Manchester called "Weavers Mill." In order to develop the Weavers Mill project Woodbury and Baskin formed a partnership in 1984 with Munro Jennings Doig, Inc. (MJD). This partnership was called Silk Mill Associates Limited Partnership. The partnership had two general partners, Munro Jennings Doig (MJD) and David C. Woodbury and Associates, Inc. (DCW). The five Baskin trusts were the limited partners. MJD was to be the managing general partner.
In 1986 there were several buyers interested in the Weavers Mill project, including Finch of Boston and Mark Breen of Century Development. A contract was entered into with Finch. While the Finch deal was pending Woodbury and Baskin without telling MJD, quit claimed Weavers Mill to Mark Breen of Century Development. Breen recorded the quit claimed deed. Litigation followed which resulted in having the quit claim to Breen declared null and void. However, the consideration extracted from MJD for Woodbury and Baskin's funding of that litigation was that MJD agree to an amended partnership agreement under which MJD agreed to a reduced share of the partnership profits and also to a formula for returning costs advanced which also reduced MJD's portion of any sale.
Efforts to market the project resumed, the Finch deal having fallen apart. The firm of Brophy Ahern emerged as the willing and ready buyer. A closing was scheduled for June 17, 1987, in the office of Jerome Baskin. Present were the buyers' attorney, Baskin, Doig and Barlow, representing the trusts. Woodbury did not attend. The parties present completed the First Amended Purchase and Sale Agreement and Escrow Agreement. Barlow agreed on that date, at the request of all present, to be the escrow agent. Barlow's role as escrow agent was to satisfy all encumbrants on the property before disbursing any monies to the sellers.
One week after the June 17, 1987 closing, in a sworn statement given by Jerome Baskin in the case of Woodbury v. SilkMill Associates et al, Baskin testified to a secret agreement dated May 21, 1986 between Woodbury, Breen and himself to cut MJD out of Silk Mills Associates. With this discovery MJD pressed for CT Page 6683 a return to the original Silk Mills Associates Limited Partnership agreement for dealing with the sales proceeds being held in escrow by Barlow. Woodbury through his attorney Maurice FitzMaurice contacted Barlow in early July of 1987 and advised Barlow that even though Woodbury had not approved the sale, his client would not object to the sale provided the sale proceeds were disbursed under the Amended Partnership Agreement.
At the same time that Attorney FitzMaurice was pressing Woodbury's position with Barlow, Doig of MJD was demanding that Barlow deliver the net sale proceeds to MJD as managing partner of Silk Mills Associates "the seller." Barlow had agreed with FitzMaurice that funds would not be disbursed until an agreement was reached as to which partnership agreement would be controlling. Subsequently, Barlow was persuaded by Doig's attorney, Attorney Mezzanotte, that as escrow agent he had to disburse the net sale proceeds to the seller, Silk Mills Associates. On July 13, 1987 Barlow advised Attorney FitzMaurice that he was going to disburse the net sale proceeds to the seller. Whereupon Attorney FitzMaurice secured a restraining order which prevented disbursement of the net sale proceeds.
The restraining order was followed by lawsuits brought by MJD and Woodbury. Those together with other litigation already in progress resulted in a plethora of pleadings spanning several years. During this time Barlow continued to hold the net sale proceeds in escrow as escrow agent, continued as trustee of the funds, and assumed the role of attorney for the funds appearing in behalf of the trusts, which were to be recipients of Jerome Baskin's share of the net sales proceeds, whatever that amount finally turned out to be.
A series of pre-trials with Judge O'Connor in 1990 resulted in a settlement agreement under which the attorneys were asked to reduce their legal fees as one way of increasing the amount available for settlement purposes. Barlow understood this to mean the trusts would have to absorb the total amount of his escrow fees rather than having those fees stand as an expense to be shared in by all the parties. None of the other attorneys were aware that the escrow fees were not coming off the top. They were under the impression they had been factored in, that the escrow fees had been satisfied from the gross proceeds. Even though Judge O'Connor said legal fees, Barlow assumed Judge O'Connor meant his escrow fees since the trust funds had no money to pay any legal fees. A final judgment to all pending litigation was CT Page 6684 entered by the court on December 6, 1993.
In 1992 while the proposed settlement agreement as to the litigation was pending the beneficiaries of the trusts had asked Barlow to resign. They expressed dissatisfaction with the terms of the proposed settlement seeking a somewhat larger percentage distribution of the proceeds than that which was incorporated in the final proposed agreement. Barlow felt it would not be in the best interest of the funds to step down at that point and continued on until the settlement agreement was reduced to judgement.
A hearing was held by Probate Judge William Fitzgerald on the matter of Barlow's fees which encompassed his work as trustee, as escrow agent and as attorney for the trust. The entire claim submitted by Barlow was allowed except for $318 which was a clerical error.
A trustee is entitled to a reasonable compensation for his time spent in the managing of a trust. Bissell v. Butterworth,97 Conn. 605, (1922). In determining what constitutes reasonable compensation the court in, Hayward v. Plante, 98 Conn. 374 (1923) sets forth nine factors to be considered: 1) size of the estate; 2) responsibilities involved; 3) character of the work required; 4) special problems and difficulties met; 5) results achieved; 6) knowledge, skill and judgment required of and used by the fiduciary; 7) manner and promptitude; 8) time and service required; 9) any other circumstances which may appear relevant and material to the determination.
All of a fiduciary's duties must be discharged with the utmost regard for the beneficiary's interests. Dunham v. Dunham,228 Conn. 303 (1987). It is the duty of the trustee to administer the trust solely in the interests of the beneficiaries. See Scotton Trusts, Sec. 1170. There is an implied duty to keep the beneficiaries informed and to consider their opinions. Konover v.Zeller, 228 Conn. 206 (1994). However, the trustee may act even if the beneficiaries disagree and this discretion is based on the superior knowledge and skill which the trustee is to utilize.Konover Corp. v. Zeller, supra.
The appellants have pursued this appeal on the theory that Barlow as trustee is entitled to be paid only if he has met those standards applicable to trustees. The first of which is undivided and unqualified loyalty to the trust. Their claim is that since CT Page 6685 he did not demonstrate that degree of loyalty called for he is not entitled to the fees awarded him. The linchpin of this claim is that when Barlow as escrow agent had in his possession the net sale proceeds of the Weavers Mill property he delayed disbursing those proceeds to the "seller," Silk Mill Associates Limited Partnership, from which the trusts would then have received their share of those proceeds. This claim is premised on the proposition that Barlow as trustee had the funds in his possession. This was not the case however. Barlow as trustee never had the sale proceeds in his possession. Barlow solely as escrow agent had the sale proceeds in his possession. As escrow agent he had a responsibility to all of the parties who had an interest in those proceeds. As escrow agent he did not have anymore responsibility to the trusts than he had to all other interested parties. When it became clear that those interested parties were raising questions as to which agreement was going to control the distribution of the proceeds he was holding, Barlow was understandably concerned since releasing the net proceeds to the "seller" would give MJD, the proponent of the "original agreement," control of the funds. The restraining order filed by Atty. FitzMaurice in behalf of Woodbury, proponent of the "amended agreement" effectively put the matter on hold until the question was resolved. A similar result might have been achieved had Barlow as escrow agent petitioned the court on his own for guidance. The problem at this point was that Barlow was being pressured by Jerome Baskin and Doig to act as trustee to get the monies for the trusts while Woodbury through his attorney were making it clear that as escrow agent he acted at his peril since he was privy to information which raised a significant question as to whether distribution of the net sale proceeds should take place before those questions were resolved.
Next we have Barlow in his role as attorney representing the trusts' interests in the litigation which followed. That litigation spanned years, culminating in an agreement which precluded what would have been a long and costly trial of the several cases involved. Here again the appellants claim Barlow should not have agreed to the settlement but rather should have held out for an earlier proposal which would have meant a higher percentage distribution to the funds. Under the earlier proposal which had not been agreeable to all parties involved, the percentage distribution to the funds would have been 25%. The final proposal had the distribution to the funds at 21%. A trial of four months would have left the funds with little or no money. Barlow in his capacity as trustee determined the trusts would be CT Page 6686 best served with a settlement. The appellants' claim that the trusts had only a peripheral interest in the litigation clearly understates the importance of Barlow functioning in his capacity as attorney for the trusts. He was a significant player throughout the settlement discussions with Judge O'Connor. He also exercised as the attorney for the trust the responsibility to be present as an appearing attorney at those proceedings which he in his best judgment felt required his presence.
Part of the settlement discussions included Judge O'Connor's request to all counsel of record that they reduce their legal fees. Barlow as attorney for the trust had it within his power to reduce the fee he would charge the funds for his legal representation. He chose not to do that. Instead he elected to charge the funds for his fees as escrow agent.
As trustee for the funds Barlow had to reject any effort to charge the funds anything more than their proportional share of the escrow fees. As attorney for the funds Barlow was without authority to negotiate his fees as escrow agent so that the overall settlement figure came out higher than it would have if the escrow fees had been factored in for all parties to share.
There is also the matter of the escrow agent fees incurred after Barlow had resigned as trustee for the funds. Those fees were also claimed by Barlow in his accounting to the probate court. Those fees are problematic in two respects. First, once again the funds are looked to to absorb the whole amount of these fees. Secondly, there is no agreement that Barlow was to be compensated by anyone for his continuing activity as escrow agent after the settlement agreement went to judgment. As escrow agent it was his responsibility to advise the parties approaching him to carry on through the final distribution of the settlement proceeds, what if anything it was going to cost and to have an agreement as to where the money was to come from. Here again, Barlow as escrow agent, Barlow as trustee, Barlow as attorney for the fund, Barlow in any capacity cannot decide that the trust funds will carry more than their proportion share of the escrow agent fees.
Since the accounting which was presented to the probate court does not separate out the fees Barlow was charging as escrow agent this court will hold a hearing to receive evidence as to the amount of the escrow fees which were included but not separately designated in the accounting presented to the probate CT Page 6687 court.
Mary R. Hennessey, Judge