[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION AFTER TRIAL ON THE MERITS
The merits of the above-captioned case came before the court in a nonjury trial that was concluded on February 9, 2001. In its complaint, Springfield Oil Services, Inc. ("Springfield") alleges that it owns three promissory notes executed by the defendant, John Conlon ("Conlon"). Springfield alleges that Conlon executed three notes, each in the amount of $50,000, as part of his purchase of a unit of a limited partnership, known as Salisbury Associates ("Salisbury"), formed to drill for oil and natural gas. Springfield acquired the notes by assignment from Salisbury. Springfield alleges that the notes became due on December 31, 1991, December 31, 1992, and December 31, 1993, respectively, and that Conlon failed to pay the amounts due when Springfield demanded payment.
Conlon admits having signed the notes but has pleaded four special defenses alleging that the notes are unenforceable because of misconduct by the general partner of Salisbury. Conlon claims that the general partner improperly funded the drilling program using the promissory notes of limited partners. He further claims that the general partner acted wrongfully by dissolving the partnership for reasons other than those authorized in the partnership agreement, by disposing of the partnership's assets without adequate consideration, by converting the partnership's assets to its own use, and by failing to inform limited partners of the business affairs and financial records of the partnership.
Prior to trial, the defendant withdrew his fifth special defense, which had alleged the expiration of the statute of limitations.
Findings of Fact
Harvest Oil Company ("Harvest") was the general partner of the limited partnership known as Salisbury Associates. Harvest and Springfield are CT Page 3881 owned and controlled by the same entities, have the same officers, and occupy the same office in Great Neck, New York. Springfield conceded at trial that it is not a holder in due course of the notes it seeks to enforce against Conlon, a limited partner of Salisbury, a partnership in which Harvest, Springfield's affiliate company, was the general partner.
Salisbury was a limited partnership formed for the purpose of exploratory drilling for oil and natural gas. Units in this limited partnership were offered to investors in a private placement memorandum which stated conspicuously at the beginning of the memorandum:
 INVESTMENT IN THE UNITS DESCRIBED HEREIN INVOLVES A HIGH DEGREE OF RISK, AND ONLY THOSE PERSONS WHO ARE ABLE TO BEAR THE FINANCIAL RISKS REFERRED TO IN THIS MEMORANDUM SHOULD CONSIDER PURCHASING SUCH UNITS.
The private placement memorandum stated clearly that Springfield, the party with which the partnership was contracting to do the actual exploration and drilling, was an affiliate of Harvest, the general partner. The private placement memorandum noted that in addition to the hope of developing successful wells, the investment carried the tax advantage of a pass-through to limited partners:
 Although the Partnership is intended to appeal to potential Limited Partners primarily as an investment, because of the significant risks involved, the favorable Federal income tax treatment presently available with respect to oil and gas drilling programs has a material effect on the desirability of investing in the Partnership for certain taxpayers.
Defendant Conlon was, at the time of buying a full unit in Salisbury, a securities trader who resided in Greenwich, Connecticut from 1981 through 1989. The court finds that his almost total lack of memory with regard to the transaction can be explained only by an inference that the investment did not involve a significant part of his assets and may have been entered into primarily for the favorable tax treatments of the partnership expenses in the initial years. While the initial investment was $25,000, in cash, with the rest of the investment taking the form of the three $50,000 subscription notes payable in the future, the I.R.S. schedule K-1 issued by Salisbury to Conlon for 1981 indicates that Conlon was allocated approximately $70,000 of losses that could be used to offset tax liabilities from other income.
Springfield performed oil exploration services pursuant to its contract CT Page 3882 with Salisbury. While some wells produced to some extent, the proceeds of sales of gas and oil were not enough to allow expenses to be paid from the output of the wells. Salisbury issued periodic reports to the limited partners, including Conlon, between 1981 and June 1985.
The contract between Salisbury and Springfield, referred to in the private placement memorandum as the "turn key contract" provided that Springfield would drill five wells between 1981 and 1983 and that Salisbury would pay Springfield $700,000 in each of the first two years for acquisition and drilling of the first three wells and an additional $700,000 for drilling the fourth and fifth wells, payable partly in cash and partly in interest-bearing notes, with the accrued balance due under the contract on the same dates on which the limited partners' subscriptions notes were due: December 31, 1991, December 31, 1992, and December 31, 1993.
On October 20, 1989, Harvest, Salisbury's general partner, sent to the limited partners a proposal to dissolve the partnership. Harvest pointed out that the wells were not productive enough to pay off the limited partners' promissory notes from production profits and that there had been changes in the federal tax code in the Tax Reform Act of 1986 that led the general partner to decide that the best course was to terminate the activities of Salisbury. Harvest advised Conlon in this letter that he could end his liability under the subscription notes by an immediate payment to Springfield in the amount of "$45,000 as full and final settlement of your Note" or extend the due dates by providing new promissory notes due in fifteen years with an additional payment of $22,500. No evidence was presented to establish that Conlon responded in any way. By a letter dated April 11, 1990, Harvest advised Conlon that the Salisbury Associates partnership had been dissolved as of December 31, 1989, and that since he had not responded to the letter of October 20, 1989, the notes would be payable on their original due dates. Conlon did not respond.
On December 31, 1989, Salisbury Associates assigned the subscription notes executed by Conlon to Springfield Oil Services, Inc., which demanded payment of the three notes plus interest in a letter dated November 9, 1995.
Though the turn key contract obligated Springfield to drill just five wells, the limited partnership agreement that Conlon signed on December 31, 1981, states at Article 6.5 that the general partner has "in its sole discretion" the right to extend the drilling beyond the five initial wells but that "[s]uch additional wells may only be drilled with funds which are either: (i) nontaxable cash flow of the Partnership; or (ii) proceeds from loans against the Partnership's share of production from CT Page 3883 wells drilled on the Prospects."
The limited partnership agreement provided that Salisbury could be dissolved upon a number of events transpiring, including a vote of the partners or disposition and sale of all partnership property (Article 9.1); and it further provided that upon dissolution, the assets should be used to pay all partnership debts, with any excess to be disbursed to the partners (Article 9.3, 9.4)
The evidence did not establish whether the partnership was dissolved by a vote of those partners who responded to the October 20, 1989, letter that Conlon ignored or whether it was dissolved for other reasons.
Defenses to Claim for Payment of Notes
Defendant Conlon does not dispute that he executed the three subscription notes in the amount of $50,000 each as part of the price of his unit as a limited partner in Salisbury. He claims, rather, that Springfield, which holds the notes as assignee, cannot enforce them because Harvest, as general partner, breached its partnership duties to him by failing to maintain books and records, by using the subscription notes of the limited partners to fund an extension of the drilling program, and by dissolving the partnership for reasons other than those contained in the agreement and without a vote of the limited partners. Defendant Conlon further asserts that Springfield cannot enforce the notes because "[d]uring the course of its management of the Limited Partnership, the General Partner breached its fiduciary duties to the Limited Partner" by assigning the subscription notes to Springfield, by disposing of the assets of Salisbury without adequate consideration, and by "failing to keep the Limited Partners informed of the affairs of the Limited Partnership." In his third special defense the defendant claims that Harvest entered into contracts with Springfield that were not arms-length contracts and that it "is thereby liable to the Limited Partners for conversion of the assets of the Limited Partnership." As a fourth special defense, the defendant alleges that Harvest "failed to exercise good faith and integrity."
Though several of the allegations in the special defenses have the ring of allegations of liability, the defendant has filed no counterclaim against Springfield, nor has it impleaded Harvest in order to allege counterclaims against it. Defendant Conlon has raised the issues set forth above not as affirmative causes of action, but as defenses to Springfield's attempt to enforce the three subscription notes.
Consequences of Lack of Holder in Due Course Status
CT Page 3884
"A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds." Conn. Gen. Stat. § 42a-3-306.
The plaintiff has conceded that it is not a holder in due course with regard to the notes and that it is subject to the defenses that Conlon had against enforcement by Harvest.
Burden of Proof/Nature of Fiduciary Relationship
The Connecticut Supreme Court has ruled that when a limited partner raises a claim of malfeasance against a general partner, the latter, as a fiduciary, has the burden of proving by clear and convincing evidence that it acted in accordance with its responsibilities as a fiduciary.Konover Development Corp. v. Zeller, 228 Conn. 206, 219 (1994).
The plaintiff takes the position in its post-trial brief that despite the Supreme Court's ruling in Konover, supra, the burden of proof of breach of fiduciary duty is on the defendant because he raised the issue in special defenses, for which the burden of proof typically rests on the pleader. The plaintiff overlooks the fact that in Konover, supra, the claims of breach of fiduciary duty were raised in counterclaims by the limited partner against the general partner. The fact that the pleader of a counterclaim generally has the burden of proof with regard to such a claim did not alter the Court's determination that the burden of proof was on the fiduciary to prove by clear and convincing evidence that, contrary to the limited partner's claims, he had conducted himself in accordance with his obligations as a fiduciary. Konover v. DevelopmentCorp. v. Zeller, supra, 228 Conn. 229; Oakhill Associates v. D'Amato,228 Conn. 723, 726-27 (1994).
The Court indicated in Konover, however, that the nature of the duties of a fiduciary may vary depending on such factors as the relative sophistication of the parties. Konover Development Corp. v. Zeller,
supra, 228 Conn. 227:
 We agree with the thrust of these commentaries that, in general, in the context of a commercial limited partnership the fiduciary relationship must be flexible enough to ensure that partners with diverse interests will be able to craft and rely on a partnership agreement that reflects their common interests. The law should recognize that an overly strict interpretation of partnership loyalty might CT Page 3885 stifle the limited partnership form, and enable a limited partner to exploit its status as beneficiary to hold a general partner hostage to the partnership. See II A. Bromberg L. Ribstein, [Partnership (1944)] § 7.01, p. 7:10. We also recognize, however, that an active general partner may use its position in the partnership for its advantage at the expense of a passive limited partner, and that, therefore, wise public policy counsels the retention of the fiduciary principle. We must search for a balance between flexibility and fidelity.
The Court, adopting a framework set forth by the Illinois Supreme Court, stated that "[i]mportant factors in determining whether a particular transaction is fair include a showing by the fiduciary: (1) that he made a free and frank disclosure of all the relevant information he had; (2) that the consideration was adequate; and (3) that the principal had competent and independent advice before completing that transaction." Konover Development Corp. v. Zeller, supra, 228 Conn. 228. The Connecticut Supreme Court did not rule that such factors are the exclusive ones to be considered, nor that they are applicable in every transaction. The Connecticut Supreme Court noted that in the transaction at issue in Konover it would consider "the relative sophistication and bargaining power among the parties."
In assessing the merit of the defense of breach of fiduciary duties, the court will consider whether the plaintiff demonstrated by clear and convincing proof that it acted in accordance with its duties as a fiduciary in the circumstances at issue.
Merits of the Special Defenses
By the express terms of the turn key contract, Salisbury was obligated to pay the plaintiff $700,000 in each of two years for the acquisition and drilling of the first three wells and $700,000 for the acquisition and drilling of the fourth and fifth wells, for a total of $2.1 million. (Ex. 1, p. 68; Turnkey Contract, Ex. 1 within Court Ex. 1, p. 3.) Payment was to be made partly in cash and partly by notes from the Salisbury to Springfield, with interest at 6% per year. These terms were clearly set forth in the description of the turn key contract contained in the private placement memorandum, and the defendant acknowledged receipt of that memorandum as one of the closing documents. (Ex. 2.) The defendant was a sophisticated securities trader, pursuing an occupation in which private placement offerings are familiar documents. The identity of the driller as a affiliate of the general partner and the amount of compensation were also clearly set forth in the private placement CT Page 3886 memorandum.
The plaintiff proved by clear and convincing evidence that five wells were in fact drilled during the first three years of operation. Reports concerning these wells and K-1 tax schedules reflecting each limited partner's share of profits or losses were issued to the defendant. Salisbury's financial records reflect that $64,667.10 was paid on the turn key contract in 1981 and that no payments were made in 1982 or 1983, so that the balances due at the time that Salisbury dissolved were in excess of the subscription notes of the limited partners, which would come due in 1991, 1992, and 1993. Since Salisbury was contractually obligated to pay the plaintiff $2.1 million for drilling the five wells, the court finds that the assignment of the subscription notes of the limited partners to Springfield in satisfaction of that obligation did not constitute a breach of fiduciary duty.
In his first special defense the defendant alleges that the subscription notes were assigned to meet obligations resulting from the extension of the drilling program beyond the initial five wells. The text of the turn key contract and the financial records produced indicate that the debt to the plaintiff that was satisfied in part by the assignment of the subscription notes related instead to the contract to drill the initial five wells, and that Salisbury's obligation to the plaintiff arose from the initial obligation, not from any extension of the drilling program.
The defendant's claims in his first and second special defenses that Salisbury failed to keep adequate books and records do not identify any basis for his position that he should not be held liable on the subscription notes. The quality or lack of quality of the record-keeping did not create the liability for the cost of drilling the initial five wells.
The defendant's remaining special defenses are to the effect that the terms of the turn key contract constituted self-dealing between Harvest and the plaintiff, and that any obligations thereunder cannot be met with the obligations of the limited partners.
The identity of Springfield as an entity affiliated with Harvest was clearly set forth in the private placement memorandum: "The Partnership has entered into a [t]urn key [clontract with Springfield, an affiliate of the General Partner.(the "[t]urn key [c]ontract") whereby it has agreed to transfer each drill site to the Partnership and fulfill the Partnership's obligation to participate in the drilling of each well for a fixed [t]urn key Price of $700,000 for the Initial Wells and $700,000 plus documented price increases in drilling for the fourth and fifth CT Page 3887 wells." (Ex. 1, p. 3) This disclosure that Springfield was a Harvest affiliate appeared in the explanation that the costs of the turn key contract would be met with the subscription notes of the limited partners (Ex. 1, p. 3). The memorandum clearly disclosed at page 14 that Bentley J. Blum, who held a controlling interest in Harvest, "is the sole stockholder in Springfield Oil Services, Inc." and explained that Springfield was a party to the [t]urn key [c]ontract, the terms of which were set forth in the memorandum. The "self-dealing" raised in the defendant's special defense is thus explicitly stated in the private placement memorandum.
As the Supreme Court pointed out in Konover Development Corp. v.Zeller, supra, 228 Conn. 227-28, the nature of a party's duties as a fiduciary varies according to such factors as the relationship between the parties, their relative sophistication and bargaining power, and the nature of the transaction at issue. In the transaction at issue, a sophisticated securities trader reviewed a private placement memorandum which explicitly and repeatedly set forth the fact of Harvest's affiliation with Springfield and the terms of the contract into which the affiliates had entered and which would control the disposition of a limited partner's subscription notes. He clearly reached his own conclusions that the consideration in view of the potential benefits of the investment justified the purchase price, most of which was deferred by ten or more years. While the terms of the limited partnership did not remove Harvest's obligation to act as a fiduciary, Konover, supra,228 Conn. 226 ("the terms of a limited partnership agreement cannot negate the fiduciary duty"), the court finds that the plaintiff has proven by clear and convincing evidence that this fiduciary duty was discharged by the full disclosure of the relationship and terms that have resulted in the assignment of the defendant's subscription notes to the plaintiff, and by use of the subscription notes as a partnership asset only to fulfill an obligation clearly identified in the private placement memorandum.
The consideration has been shown by clear and convincing evidence to have been adequate. Though the venture involved considerable risk, it also presented the hope of a share in successful oil and gas wells as well as an extremely advantageous tax advantage even if the drilling program was unsuccessful.
Though there was no evidence that the defendant obtained independent advice concerning the transaction, his status as a securities trader strongly suggests that he relied on his own expertise in the area of investments. The evidence further establishes that Harvest offered Conlon an arrangement by which he could avoid his full obligations on the notes by immediate payments of lesser amounts, a further indication of conduct CT Page 3888 consonant with Harvest's responsibilities as a general partner with fiduciary responsibilities to a limited partner.
The evidence does not support Conlon's view that the notes were pledged for drilling for wells other than the first five wells for which the drilling fees were clearly specified in the private placement memorandum.
The plaintiff did not prove by clear and convincing evidence that Harvest supplied Conlon with regular reports of the activities of the partnership, other than K-1 tax statements. This conduct does not, however, constitute a breach of duty that caused Conlon to suffer any loss.
Having assessed all of the defendant's special defenses on the basis that the plaintiff had the burden of proof by clear and convincing evidence on each of the issues raised, the court does not find the plaintiff's claims to be barred for any of the reasons asserted by the defendant.
Merits of the Plaintiff's Claim
By their terms, the three notes in the amount of $50,000 each were due on December 31, 1991, December 31, 1992, and December 31, 1993, respectively. Each note provides for interest at the rate of twelve percent per year, and the maker agreed in each note "to pay fifteen percent (15%) additional on the principal and interest then due hereon as attorney's fees."
The court finds that the amount due the plaintiff as assignee of the note due on December 31, 1991, is $50,000 plus interest from the date of maturity at the rate of twelve percent in the amount of $55,298.63 plus fifteen percent of the sum of those amounts as contractual attorney's fees, that is, $15,794.79 (.15 x $105,298.63). The court finds that the amount due the plaintiff as assignee of the note due on December 31, 1992, is $50,000, plus interest from the date of maturity in the amount of $49,298.63 plus fifteen percent of the sum of those amounts as contractual attorney's fees, that is, $14,894.79 (.15 x $99,298.63). The court finds that the amount due the plaintiff as assignee of the note due on December 31, 1993, is $50,000, plus interest from the date of maturity in the amount of $43,298.63 plus fifteen percent of the sum of those amounts as contractual attorney's fees, that is, $13,994.79 (.15 x 93,298.63).
Conclusion
CT Page 3889
Judgment shall enter in favor of the plaintiff in the amount of $342,580.30. The plaintiff shall recover its statutory costs upon filing a bill of costs with the clerk of the court.
Beverly J. Hodgson Judge of the Superior Court