******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DAVID FALCIGNO *v.* STEPHEN FALCIGNO
## (AC 42047)

Lavine, Bright and Sheldon, Js.*

*Syllabus*

The plaintiff sought to recover damages for breach of fiduciary duty from the defendant, his brother, in connection with his sale of shares representing a minority interest in a family business, S Co. The parties were often at odds with each other, and the plaintiff approached the defendant about selling his shares of S Co. to him. The parties ultimately agreed on a price of $200,000 for the plaintiff's shares. The defendant stated that he would revisit the compensation he had paid if he later sold S Co. for "millions." More than one year later, the defendant sold S Co. for $8 million. Subsequently, although the plaintiff and the defendant arranged to meet, they were unable to agree on the plaintiff's request for additional compensation. Following a trial to the court, the trial court found in favor of the defendant on all counts of the plaintiff's complaint and in favor of the plaintiff on a counterclaim brought by the defendant, from which the plaintiff appealed and the defendant cross appealed to this court. *Held*:

1. The plaintiff could not prevail on his claim that the trial court's finding that the defendant proved by clear and convincing evidence that he engaged in fair dealing and full disclosure was clearly erroneous and was inconsistent with its finding that the defendant had made false representations to the plaintiff that S Co. was a "dinosaur" and was falling apart; the court rejected the plaintiff's claims of misrepresentation, which the plaintiff had not claimed as error, and the evidence demonstrated that the plaintiff knew that his shares would be worth more if and when the defendant sold S Co., he knew that his shares were worth more at the time he sold them to the defendant, the plaintiff wanted to sell his shares to remove himself from family disputes, he willingly accepted only $200,000 because he was planning to build a new home and that this was his mistake, not based on misrepresentations made by the defendant, the court clearly found that this "misrepresentation" was not material and that it was not truly a misrepresentation, and that the plaintiff did not rely on the defendant's representation that S Co. was a "dinosaur."

2. The plaintiff could not prevail on his claim that the trial court erred in finding that the defendant proved by clear and convincing evidence that he engaged in fair dealing and full disclosure as to his purchase of the plaintiff's minority shares of S Co. stock when the evidence demonstrated that the defendant failed to disclose all relevant information to the plaintiff, including that he was applying a minority discount to his purchase of the plaintiff's shares, and that he would be seeking to profit from the purchase of those shares upon a future sale of S Co., as the trial court's finding that the defendant had met his burden of proving fair dealing by clear and convincing evidence was not clearly erroneous; the court specifically found that the defendant explained to the plaintiff the significance of the minority discount in practical terms, and the evidence demonstrated that the defendant told the plaintiff that he did not need his shares because he already had control of S Co., and that the defendant disclosed all relevant information and gave the plaintiff access to S Co.'s financial documents and tax returns and advised him to speak to S Co.'s accountant, and was honest and fair in his interaction with the plaintiff.

3. The plaintiff could not prevail on his claim that the evidence demonstrated that the defendant did not prove fair dealing and full disclosure with clear and convincing evidence under each of the four requirements set forth in *Konover Development Corp.* v. *Zeller* (228 Conn. 206) for fiduciaries, as the *Zeller* framework, which permits a more relaxed fiduciary duty in certain situations, was inapplicable: given that the *Zeller* framework is more forgiving to the fiduciary than is the traditional analysis applied by the court, this court failed to see how the plaintiff could have benefitted from its application; moreover, the court fully

considered, while applying the correct legal test, all of the facts relied on by the plaintiff in support of his breach of fiduciary claim.

4. The trial court did not improperly render judgment in favor of the plaintiff on the defendant's counterclaim seeking attorney's fees pursuant to a certificate of satisfaction signed by the plaintiff when he transferred his shares to the defendant, as the language of the certificate was clear and unambiguous, and, pursuant to the plain language, it did not apply to the case; read in its entirety, the language of the certificate clearly set forth the plaintiff's obligation to defend his interest and rights in the shares from claims made by third parties to those shares, and to hold the defendant harmless and to protect him from such third-party claims, and the plaintiff properly characterized the certificate as applicable only to a third-party claim challenging the plaintiff's unencumbered interest, title, and right to his shares and his absolute right to sell his shares to the defendant.

Argued March 4—officially released August 25, 2020

*Procedural History*

Action to recover damages for, inter alia, breach of fiduciary duty, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the defendant filed a counterclaim; thereafter, the court, *Ecker, J.*, granted in part the defendant's motion for summary judgment; subsequently, the matter was tried to the court, *Hon. Thomas J. Corradino*, judge trial referee; judgment for the defendant on the complaint and for the plaintiff on the counterclaim, from which the plaintiff appealed and the defendant cross appealed to this court. *Affirmed.*

*Chet L. Jackson*, for the appellant-cross appellee (plaintiff).

*Barbara M. Schellenberg*, with whom was *Robert R. Lewis*, for the appellee-cross appellant (defendant).

*Opinion*

BRIGHT, J. Following a trial to the court, the plaintiff, David Falcigno, appeals from the judgment of the trial court rendered in favor of the defendant, Stephen Falcigno, on his cause of action for breach of fiduciary duty. The defendant cross appeals from the judgment of the court, rendered in favor of the plaintiff, on the defendant's counterclaim for breach of the representations and warranties contained in an agreement signed by the plaintiff. In his appeal, the plaintiff claims that the court erred in finding that the defendant proved, by clear and convincing evidence, fair dealing and full disclosure as to the defendant's purchase of the plaintiff's minority shares of stock. In his cross appeal, the defendant claims that the court improperly failed to award him attorney's fees pursuant to the agreement that the plaintiff signed as part of the stock transaction. We affirm the judgment of the trial court.

The following facts, as found by the court, *Hon. Thomas J. Corradino*, judge trial referee, or as uncontested in the record, and the relevant procedural history assist in our review of the parties' claims. The parties, who are brothers, and another brother, Richard Falcigno, together owned individual shares of stock, which totaled 100 percent of all the stock in a family business, Statewide Meats and Poultry, Inc. (Statewide). The defendant owned 60 percent of the shares, with each of his brothers owning 20 percent of the shares. Over the years, the defendant, who operated Statewide, allowed his brothers to get free gas and meat from the business, and, from approximately 2005 forward, the defendant paid each of his brothers a $14,000 yearly consulting fee, although there was no evidence that they rendered any services in exchange for those fees.[1]

The plaintiff was aware, since at least 2005, of the defendant's ultimate goal to sell Statewide. The brothers often were at odds with each other, and, in 2009, the plaintiff told the defendant that he wanted to sell his shares of Statewide to the defendant so that he could escape the turmoil and be brothers again with the defendant; he also needed money to build a house.[2] The defendant told the plaintiff to contact Matthew Giglietti, the certified public accountant for Statewide, who also is a cousin of, and the personal accountant for, the parties and their brother, Richard, and to get whatever he needed from Giglietti.[3] He encouraged the plaintiff to exercise due diligence with regard to the proposed stock sale and told the plaintiff that he could have access to anything he wanted for that purpose. The defendant acknowledged at trial that Giglietti had Statewide's balance sheets, ledgers, payroll records, and tax returns.

The plaintiff obtained and reviewed Statewide's tax returns, and he discussed selling his shares with Gig-

lietti, telling him that he just wanted the fighting to end and that he thought selling his shares to the defendant might accomplish that end. Giglietti repeatedly advised the plaintiff not to sell his shares. Giglietti told the plaintiff that he estimated that Statewide was worth $2 million. The plaintiff was aware that Statewide had a certified Angus beef license (CAB license),[4] and that it repeatedly won awards for being part of the "million pound club" for substantial sales of high quality beef. He also was aware of Statewide's customer base. The plaintiff had access to Statewide's balance sheet for 2008, and he had Statewide's tax returns going back several years before 2009, which indicated $17 million to $18 million in gross annual sales, which, the court found, "could only result from a strong customer base."

On September 9, 2009, the plaintiff and the defendant met at Luce Restaurant (Luce), along with the family's personal stock and bond broker, Fred Mueller, to discuss the terms of the sale. The plaintiff initially stated that he wanted $450,000 to $500,000 for his shares, and the defendant initially offered $100,000. The defendant explained to the plaintiff that because he was the majority shareholder and already controlled Statewide, he did not need the plaintiff's shares. After discussions, the parties ultimately agreed on a price of $200,000, and the defendant stated that he would revisit the compensation or cut the plaintiff back in if he later sold Statewide "for millions."[5]

The defendant asked Statewide's attorney, Mark Sklarz, to draft the necessary paperwork for the stock transfer. Sklarz drafted documents, including, a certificate of purchase, a stock power form, a certificate of satisfaction, and an affidavit of lost certificate.[6] Sklarz then provided the plaintiff with the certificate of purchase and the stock power form, so that he could sign the documents and have them notarized, which he did on October 9, 2009. On October 13, 2009, the plaintiff and the defendant met at Sklarz' office to close the sale. In connection with the closing of the sale, the plaintiff executed the certificate of satisfaction. The certificate of purchase signed by the plaintiff indicated that the sale price of the shares was $200,000. After the parties finished their business with Sklarz, the defendant gave the plaintiff a paper bag containing $50,000 in cash.[7] The court found that "there [was] not an iota of evidence [that] the defendant over the years, since he had made it his goal to sell Statewide, ever tried to induce the plaintiff to sell his shares."

Around September, 2010, at a certified Angus beef conference, a representative of Sysco Corporation (Sysco) approached the defendant and asked if he might be interested in selling Statewide. The defendant told the representative to call him if Sysco was interested in buying the company. In January, 2011, a representative of Sysco met with the defendant. A few months

later, Sysco sent the defendant a letter of intent, indicating that it was interested in purchasing Statewide. Following subsequent negotiations, Sysco ultimately made a firm offer of $8 million, consisting of $6 million up front and an additional $2 million earn-out if Statewide maintained a certain level of sales.[8] Sklarz testified that he was "substantially surprise[d]" by the offer because it "was substantially in excess . . . of what [the defendant and he] . . . anticipated." He also testified that they had thought that Statewide was worth "somewhere in the neighborhood of two to three million dollars based on the financial statements . . . ." The sale closed on August 12, 2011.[9] Giglietti testified that it appeared that Sysco was not "terribly interested in the [Statewide] operation itself. As a matter of fact, they closed it up soon [after the sale] so they didn't care about [the] equipment or [the] trucks or anything like that. I think the main thing they were looking for was the customers, and, quite frankly, they were looking at the CAB license."

In or around April, 2012, the plaintiff and the defendant arranged to meet at the Quinnipiac Club in New Haven. The plaintiff was surprised because the defendant brought Attorney Jeffrey Hellman to their meeting. Hellman testified that the defendant offered the plaintiff a "gift" of $100,000, but the plaintiff stated that he was entitled to more and requested $250,000. By the end of the meeting, Hellman believed that the plaintiff was going to accept the $100,000, and, within a day or two, he drafted an agreement for the parties to sign.

On June 1, 2012, the plaintiff and the defendant met at Mueller's office, where the defendant was to give the plaintiff the $100,000 "gift." After the parties arrived, the defendant asked the plaintiff to sign the agreement prepared by Hellman, which provided in relevant part: "David Falcigno . . . hereby releases Stephen Falcigno . . . of and from any and all actions . . . claims . . . agreements, promises . . . or demands . . . of any kind whatsoever including, but not limited to any claims concerning the shares of Statewide . . . from the beginning of the world to the date of this agreement." It does not appear that the plaintiff signed the agreement. Unbeknownst to the defendant and Mueller at the time, the plaintiff made an audio recording of this meeting.

On October 5, 2012, the plaintiff commenced the present action. His June 14, 2013 revised complaint was brought in ten counts: Count one, breach of contract; count two, promissory estoppel; count three, fraudulent concealment; count four, fraudulent misrepresentation; count five, negligent misrepresentation; count six, breach of fiduciary duty; count seven, breach of the implied covenant of good faith; count eight, unjust enrichment; count nine, unlawful conversion; and count ten, statutory theft in violation of General Statutes § 52-

564. At the time of trial, five of the plaintiff's counts remained viable, namely, breach of contract, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty. The defendant also had a counterclaim that remained viable, namely, breach of the representations and warranties contained in the certificate of satisfaction signed by the plaintiff when he conveyed his shares to the defendant. In a very thorough memorandum of decision, the court found in favor of the defendant on all counts of the plaintiff's complaint and in favor of the plaintiff on the defendant's counterclaim. This appeal and cross appeal followed. Additional facts will be set forth as necessary.

I

THE PLAINTIFF'S APPEAL

The plaintiff claims that the court erred in rendering judgment in favor of the defendant on the plaintiff's cause of action for breach of fiduciary duty.[10] Specifically, he argues that the court erred in finding that the defendant proved by clear and convincing evidence that he engaged in fair dealing and full disclosure as to his purchase of the plaintiff's minority shares of Statewide stock. We are not persuaded.

The trial court's determination of whether a party breached his fiduciary duty is a factual finding, and, therefore, we apply the clearly erroneous standard of review when assessing that finding. *Spector* v. *Konover*, 57 Conn. App. 121, 126, 747 A.2d 39, cert. denied, 254 Conn. 913, 759 A.2d 507 (2000). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotations marks omitted.) Id., 126–27.

"In determining whether the court's decision was clearly erroneous, we must examine the court's decision in the context of the heightened standard of proof imposed on a fiduciary." Id., 127. "Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence. . . . Proof of a fiduciary relationship, therefore, generally imposes a twofold burden on the fiduciary. First, the burden of proof shifts to the fiduciary; and second, the standard of proof is clear and convincing evidence." (Internal quotation marks omitted.) *Papallo* v. *Lefebvre*, 172 Conn. App. 746, 754, 161 A.3d 603 (2017). "Although we have not expressly limited the application of these traditional principles of fiduciary duty to cases involv-

ing only fraud, self-dealing or conflict of interest, the cases in which we have invoked them have involved such deviations." (Emphasis omitted.) *Murphy* v. *Wakelee*, 247 Conn. 396, 400, 721 A.2d 1181 (1998).

"Although not always expressly stated, the basis upon which the aforementioned burden-shifting and enhanced burden of proof rests is, essentially, that undue influence will not be presumed . . . and that the presumption of fraud does not arise from the relationship itself. We note, however, that [this] rule is somewhat relaxed in cases where a fiduciary relation exists between the parties to a transaction or contract, *and where one has a dominant and controlling force or influence over the other. In such cases, if the superior party obtains a possible benefit*, equity raises a presumption against the validity of the transaction or contract, and casts upon such party the burden of proving fairness, honesty, and integrity in the transaction or contract. . . . Therefore, it is only when the confidential relationship is shown together with suspicious circumstances, or where there is a transaction, contract, or transfer between persons in a confidential or fiduciary relationship, *and where the dominant party is the beneficiary of the transaction, contract, or transfer,* that the burden shifts to the fiduciary to prove fair dealing." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Heaven* v. *Timber Hill, LLC*, 96 Conn. App. 294, 303–304, 900 A.2d 560 (2006).

In the present case, there is no dispute as to whether the defendant, as the president and majority shareholder of Statewide, had a fiduciary relationship with the plaintiff, a minority shareholder. The court also found, and we agree, that the defendant derived a benefit from obtaining the plaintiff's shares, and, therefore, the burden of proving fair dealing shifted to the defendant. We, therefore, need assess only whether the court's finding that the defendant had proven, by clear and convincing evidence, that he acted in a fair and honest manner in his transaction with the plaintiff was clearly erroneous. We conclude that the court's finding was not clearly erroneous.

"The intentional withholding of information for the purpose of inducing action has been regarded . . . as equivalent to a fraudulent misrepresentation. . . . An officer and director occupies a fiduciary relationship to the corporation and its stockholders. . . . He occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with the corporation. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. . . . It is essential to the validity of a contract between a fiduciary and a beneficiary concerning matters within the scope of that relationship that a full disclosure be made of all *relevant* facts which the fiduciary knows or should

know. . . . [T]hese high standards [are what] the law demands of fiduciaries." (Citations omitted; emphasis added; internal quotation marks omitted.) *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, 189 Conn. 401, 407–408, 456 A.2d 325 (1983).

"Majority or controlling stockholders have a duty not to take advantage of the minority in purchasing the latter's shares. Accordingly, majority stockholders, when purchasing the stock of minority stockholders, are under a duty to disclose to them all material facts known to the majority stockholders by virtue of their position. Thus, a majority shareholder making an offer to purchase all remaining outstanding stock owes a fiduciary duty to minority shareholders, which requires complete candor in disclosing fully all of the facts and circumstances surrounding such tender offer; and the correct standard requires disclosure of all germane facts rather than mere disclosure of adequate facts.

"Absent nondisclosure, fraud, or oppression, a majority shareholder has no duty to pay a 'fair' price for shares. A shareholder in a closely held corporation does not breach the shareholder's fiduciary duties to the second shareholder by failing to disclose the true value of the corporation when the second shareholder sold their interest to the first shareholder, where there is no evidence that the first shareholder knew the true value of the corporation, and the second shareholder was advised, but refused, to obtain an appraisal. However, a majority stockholder may be held accountable as a fiduciary, where he or she is in active charge of corporate affairs and induces a minority stockholder to sell his or her holdings, concealing the true condition of corporate finances for the purpose of making a personal profit, or failing to reveal an offer from a prospective purchaser for the purchase of all of the stock of the corporation at a price which is higher than that offered to the minority holder." (Footnotes omitted.) 18A Am. Jur. 2d 529–30, Corporations § 662 (2015).

In the present case, the plaintiff argues that the court erred in finding that the defendant proved by clear and convincing evidence that he engaged in fair dealing and full disclosure as to his purchase of the plaintiff's minority shares of Statewide stock because the defendant (1) made false representations to the plaintiff by telling him that the Statewide facility at Long Wharf was a "dinosaur" and was falling apart, and (2) failed to disclose relevant information to the plaintiff and applied a minority discount when he purchased the plaintiff's shares. He also argues that the court's analysis of his claim was inadequate under the four requirements of *Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 635 A.2d 798 (1994). We will consider each of these arguments in turn.

A

The plaintiff argues that the court's finding that the defendant proved fair dealing and full disclosure was clearly erroneous and inconsistent with its finding that the defendant had made false representations to the plaintiff that Statewide was a "dinosaur" and was falling apart. He argues that "it must be highlighted that the trial court found 'the defendant represented, falsely by implication, that Statewide was a dinosaur, [and] he would only offer $200,000 for the plaintiff's shares because the place was falling apart.' " (Emphasis omitted.) He contends that "it was misleading for the defendant to tell the plaintiff he would not pay close to the plaintiff's asking price of $450,000 because the Statewide Long Wharf facility was old and falling apart. . . . [The defendant introduced] no evidence . . . that the overall physical condition of the meat businesses had any bearing on Sysco targeting businesses with the CAB license." (Citations omitted.) The defendant argues that the court found that the defendant had established that his representation of Statewide as a "dinosaur" was meaningless in light of the situation, and, therefore, this representation was not relevant to the defendant's fair dealing. We agree with the defendant.

Judge Corradino rejected the plaintiff's misrepresentation claims, and the plaintiff did not appeal from that aspect of the judgment. The court specifically reasoned: "For the court at least the misrepresentation claim is not convincing. At the meeting at Luce Restaurant where the putative sale of the plaintiff's shares was first discussed in some detail, the plaintiff said he wanted $450,000 to $500,000 for his shares. But the defendant represented, falsely by implication, that Statewide was a dinosaur, he would only offer $200,000 for the plaintiff's shares because the place was falling apart. Also the defendant said to the plaintiff that he was only a minority shareholder, the plaintiff's 20 percent ownership interest compared to the defendant's 60 percent ownership interest. The defendant had no need to buy the plaintiff's shares since he already owned a majority interest in Statewide.

"Leaving aside the possibility of a sale and looking at Statewide as an operating business, *it is difficult to conclude the defendant misrepresented*. The court has examined the tax filings for 2003 through 2007, and the balance sheet for 2008, the year before the sale of Statewide to Sysco. The gross receipts are in the range of $17 million to $18 million but when one takes account of expenses the taxable income is never higher than $131,000. The 2008 balance sheet shows net income before taxes was only $67,275.17. The plaintiff testified one year showed a loss. [Giglietti], who worked as a CPA for Statewide for over twenty years said a meat business like Statewide is not an easy business, you work on a 'small margin' and it is not a business to make a lot of money in, profits fluctuate.

"But more to the point Sysco in fact bought Statewide for $8 million over a year and a half after the plaintiff sold his shares to the defendant. Giglietti testified that the only way to put a value on a business like Statewide is what someone is willing to pay for it. Sysco did not confine itself to profit margins for the existing Statewide business operations. Giglietti, who was involved in the sale of Statewide to Sysco, testified Sysco determined what to offer based on gross sales, Statewide's CAB license (license to sell high quality meat), and mainly Statewide's customer list. There is nothing to indicate the defendant misrepresented any of these matters to the plaintiff.

"Even more importantly the plaintiff always knew the defendant intended to sell Statewide—he knew this since 2005, at least. Giglietti and Attorney Sklarz both testified Statewide was worth in their opinion, between two and four million dollars upon sale. Giglietti was [the plaintiff's] accountant, [and was] also the accountant for everyone in the family and for Statewide. The plaintiff was asked if Giglietti ever told him what Statewide was worth in 2009. The plaintiff first said he did not remember then said he was told it was worth around $2 million. He said Giglietti may have told him this before 2009—i.e., the sale of his shares.

"In the context of the foregoing *it is not possible to conclude that the plaintiff was misled about the defendant's description of the business from a day to day operational point of view as a dinosaur* and in that context his shares were not even worth $100,000. The point is that there was a prospect of a sale which both parties were well aware of and both parties knew that, that sale might reap much more money for shareholders. Thus, at the Luce meeting the plaintiff asked what would happen if Statewide was sold—he knew exactly that if it did and he retained his shares he could get much more than $200,000. The defendant's response was if Statewide sells for millions I'll cut you back in according to the plaintiff. How on earth can it be said that the defendant misrepresented what the worth of Statewide was in the context of a commodity the defendant, as the plaintiff well knew, intended to sell? It was in this regard [Giglietti] told the plaintiff not to sell his shares. He reasoned that if a buyer came along one could take into account what the buyer offered and could get much more for his shares than could be garnered from just accepting an offer for his shares prior to any sale. Later in his testimony, Giglietti was asked if he specifically told the plaintiff this reasoning. His response was: 'You know, I'm sure I might [have]. I definitely told him not to sell and those would be the reasons I would have told him not to sell.'

"Finally it is interesting to note that the plaintiff did his own due diligence to see what he would ask for his shares at Luce. He said based on the shareholder's

equity in the tax documents and his 20 percent owner-ship of Statewide shares he arrived at his figure of $450,000 to $500,000. Oddly enough this is roughly about 20 percent of the two or three million Giglietti and Attorney Sklarz, Statewide's attorney, said Statewide was worth at the time of the sale of the plaintiff's shares. That he accepted only $200,000 and relied on a general-ized cut you back in or revisit language was his mistake not based on misrepresentations as to Statewide's value or, better put, Statewide's value if it were to be sold by the defendant but on his desire to remove himself from the toxic atmosphere engendered by continuing involvement in Statewide—especially in light of the fact that he would be receiving $200,000 at the same time he was constructing a home which ended up having a value of over $500,000." (Emphasis altered.)

The plaintiff now argues, focusing only on a single statement by the court that the defendant "represented, falsely by implication, that Statewide was a dinosaur," that the court erred in concluding that the defendant proved he engaged in fair dealing because the court found that the defendant made a misrepresentation. We are not persuaded.

First, the court rejected the plaintiff's claims of mis-representation, which the plaintiff has not claimed as error, specifically holding that "*it is difficult to con-clude the defendant misrepresented*" and that "*it is not possible to conclude that the plaintiff was misled about the defendant's description of the business from a day to day operational point of view as a dinosaur . . .*" (Emphasis added.) Second, the court found that the evidence demonstrated that the plaintiff knew that his shares would be worth more if and when the defendant sold Statewide, and he knew that his shares were worth more at the time he sold them to the defendant, having asked for $450,000 after being told by Giglietti that the company was worth $2 million and that he should not sell his shares. Third, the court also found that the evidence demonstrated that the plaintiff wanted to sell his shares to remove himself from family disputes,[11] that he willingly accepted only $200,000 at the same time he was looking to build a $500,000 home, and that this was "*his mistake not based on misrepresenta-tions*" made by the defendant. (Emphasis added.) Fourth, the court clearly found that this "misrepresenta-tion" was not material and that it was not truly a misrep-resentation. As to the operation of the business, the tax returns showed little income and showed some losses. The record also demonstrates that after Sysco bought Statewide, it closed the old facility and moved to a new, larger facility in Rhode Island. Further, the court concluded that the plaintiff did not rely on the defen-dant's representation that Statewide was a "dinosaur" because he knew the company had value if it was sold, and Giglietti told him it would be worth more if sold later. Accordingly, the defendant's statement that State-

wide was a "dinosaur" has no bearing on whether he proved that he engaged in fair dealing when he purchased the plaintiff's shares.

## B

The plaintiff also argues that the defendant failed to meet his burden of proof because the evidence demonstrated that the defendant failed to disclose all relevant information to the plaintiff, including that he was applying a minority discount to his purchase of the plaintiff's shares, and that he would be seeking to profit from the purchase of those shares upon a future sale of Statewide.[12] The defendant argues that he provided the plaintiff with all relevant information, including explaining in layman's terms that he was applying a minority discount, giving him access to Statewide's financial documents, and telling him to talk to Giglietti and to do due diligence. The defendant also argues that the evidence clearly demonstrated that the plaintiff knew that his shares would be worth more than the defendant was offering if and when the defendant found a buyer for Statewide. We agree with the defendant.

The court specifically found that the defendant explained to the plaintiff "the significance of the minority discount . . . in practical terms." This finding is supported by clear and convincing evidence, which demonstrates that the defendant told the plaintiff that he did not need his shares because he already had control of Statewide. "The purpose of a minority discount is to adjust for lack of control over the business entity on the theory that [noncontrolling] shares of stock are not worth their proportionate share of the firm's value because they lack voting power to control corporate actions." (Internal quotation marks omitted.) *Swope* v. *Siegel-Robert, Inc.*, 243 F.3d 486, 495 (8th Cir.), cert. denied, 534 U.S. 887, 122 S. Ct. 198, 151 L. Ed. 2d 139 (2001).

The evidence further demonstrated that the defendant gave the plaintiff access to Statewide's financial documents and told him to talk to Giglietti and to do due diligence. The tax returns that the plaintiff obtained from Giglietti showed "gross profits in the millions which of course depended on a strong customer base." The court also found that, according to the plaintiff's own testimony, he "knew what a CAB license was . . . ."[13] The plaintiff said he examined the tax documents and took 20 percent of the shareholder's equity to formulate his demand of $450,000 to $500,000 which he initially presented to the defendant at Luce when sale of the plaintiff's [shares] was first formally discussed." (Footnote added.) Additionally, although the plaintiff testified at trial that he had no hesitation about talking to Giglietti, the court explained that when the plaintiff picked up the returns, he "did not ask Giglietti about the prospective sale and its desirability. His response as to why this was so seems to be that Giglietti was

always busy and if he ever asked Giglietti anything, it would get back to the defendant who would raise a ruckus." The court could not understand the plaintiff's professed reluctance in light of the fact that the defendant specifically had told the plaintiff to talk to Giglietti and to do due diligence. The fact that the plaintiff failed to make full use of Giglietti's knowledge is not the fault of the defendant, who specifically urged him to do due diligence and to talk to Giglietti. See generally *Pacelli Bros. Transportation, Inc.* v. *Pacelli*, supra, 189 Conn. 408 ("Where a party realizes he has only limited information upon the subject of a contract, but treats that knowledge as sufficient in making the contract he is deemed to have assumed the risk of a mistake. 1 Restatement (Second), Contracts § 154.").

Further, the court noted that "Giglietti said shareholder's equity is not a good basis for valuation of a company such as Statewide. A company such as Statewide receives an accurate valuation based on what a buyer is willing to pay for it. But both Sklarz and Giglietti estimated [that] the value of Statewide in 2009, before Sysco's offer, was two million dollars or three million. The initial demand the plaintiff came up with [was] close to 20 percent of a two million valuation figure." The court further noted that the plaintiff, in his posttrial brief, "argued that the defendant made no representations during the negotiations about the value of Statewide or the plaintiff's interest. But Giglietti told [the plaintiff that] the company was worth two million. And he certainly knew his 20 percent would be worth more than the $200,000 he was being offered, if Statewide sold, which he knew had been the defendant's goal for years. In fact, he asked the defendant at Luce, what if Statewide sold—the defendant responded, if it sells for millions, I will revisit the matter or cut you back in . . . ." The court also found that Giglietti, the accountant for Statewide and the personal advisor of the plaintiff, specifically and repeatedly told the plaintiff not to sell his shares.

On the basis of the foregoing, the court found that the defendant had explained in layman's terms to the plaintiff that he was applying a minority discount to his potential purchase of the plaintiff's shares and that the plaintiff knew about the possibility of a future sale and that it would be more advantageous to him if he did not sell his shares at that time. The court found that "the plaintiff, having received a $200,000 offer at Luce, knew by the very asking of the question—what if Statewide sells—that if he kept his shares, they would be worth more, and the defendant's comment of cutting back in or revisiting the matter only confirmed what he already knew." It also found that the defendant disclosed all relevant information because he gave the plaintiff full access to Giglietti and the financial documents and tax returns of Statewide. If the plaintiff had questions or needed more information, he certainly

could have and should have inquired.

The court found that the evidence demonstrated that the defendant was honest and fair in his interaction with the plaintiff, that he gave the plaintiff access to whatever he needed, including Giglietti, and that the plaintiff made his own decision. The evidence demonstrates that no one, including Giglietti, Sklarz, or the defendant, had any idea that Sysco or anyone else would offer $8 million for Statewide; Giglietti and Sklarz each had valued Statewide at approximately $2 million, and they genuinely were surprised by the offer in 2011, with Giglietti testifying that he would not have imagined an $8 million offer "in [his] wildest dreams." Here, the court reasoned that "none of the [defendant's] actions . . . [could] be characterized as a plot to force the plaintiff to sell his shares at a reduced price because of [some] imminent sale. There were just ongoing tensions in this family, apparently, for a variety of reasons. There was no evidence . . . that in the fifteen years before the defendant bought the plaintiff's shares [the defendant] even suggested the shares be sold to him although he had a goal of selling Statewide for years. The plaintiff made the first specific mention of wanting to do that in a heated June, 2009 call that had nothing to do with Statewide . . . . Besides, what kind of orchestrated squeeze takes place when one of the parties receives free gas and meat on a weekly basis and $14,000 a year for consultation fees when no consultation has taken place." All in all, the court ultimately found that the plaintiff wanted to sell his shares to the defendant and that the plaintiff's "real motive was to be bought out from Statewide because of the toxicity of the relations that he felt were engendered by this family business at a time when he could use any monies he received for his shares to help construct his new house." We conclude that the court's finding that the defendant had met his burden of proving fair dealing by clear and convincing evidence was not clearly erroneous.

## C

Although conceding that *Zeller* does not apply in this case, and specifically stating that he "is not himself invoking the *Zeller* standard," the plaintiff, nevertheless, also argues that the evidence demonstrates that the defendant did not "prove fair dealing and full disclosure with clear and convincing evidence under each of the four requirements in [*Konover Development Corp.* v. *Zeller*, supra, 228 Conn. 206] for fiduciaries." He also argues that the defendant failed to prove fair dealing because he created an ambiguity regarding the terms of the stock purchase when he told the plaintiff that he would cut him back in or revisit the compensation if he sold Statewide for millions. We agree with the parties that the *Zeller* framework is inapplicable, and we decline to consider the ambiguity argument because

it was not raised before the trial court and is inconsistent with the arguments raised by the plaintiff in his posttrial brief to the trial court.[14] See generally *Lopiano* v. *Stamford*, 22 Conn. App. 591, 594, 577 A.2d 1135 (1990) ("[o]ur role on review is to decide whether the trial court's decision is clearly erroneous in view of the evidence and pleadings in the record; Practice Book § 4061 [now § 60-5]; and we must dispose of a case on the theory on which it was tried and decided").

It is noteworthy to mention that, although the plaintiff cited to *Konover Development Corp.* v. *Zeller*, supra, 228 Conn. 219, *once* in his seventy-five page posttrial brief to the trial court, specifically for the purpose of characterizing the degree of trust in a fiduciary relationship, he neither raised nor argued to the trial court that the court should apply the framework adopted by our Supreme Court in *Zeller*; see *Konover Development Corp.* v. *Zeller*, supra, 227–28 (adopting framework that is flexible enough, "in the context of a commercial limited partnership [to balance the need] . . . to ensure that partners with diverse interests will be able to craft and rely on a partnership agreement that reflects their common interests" with "the principle of fiduciary honor"); or used *Zeller* as a guideline for his analysis. Nevertheless, we agree with the parties that the *Zeller* framework, which permits a somewhat more relaxed fiduciary duty in certain situations, does not apply to this case. See id.; *Spector* v. *Konover*, supra, 57 Conn. App. 128; see also Connecticut Civil Jury Instructions 3.8-2 (B) and (C), available at https://www.jud.ct.gov/ JI/Civil/Civil.pdf (last visited August 18, 2020) (differentiating traditional framework from *Zeller* framework, which is employed in cases with "sophisticated, commercial parties" wherein "parties may contractually agree that the fiduciary will gain some advantage or benefit at the expense of the principal"). In any event, given that the *Zeller* framework is more forgiving to the fiduciary than is the traditional analysis applied by the court, we fail to see how the plaintiff could have benefitted from its application in this case.

Furthermore, the trial court fully considered, while applying the correct legal test, all of the facts relied on by the plaintiff in support of his breach of fiduciary duty claim. Before the trial court, regarding his claim of breach of fiduciary duty, the plaintiff argued in his posttrial brief that the defendant had the burden of proving fair dealing, and that the defendant failed to meet that burden because the evidence demonstrated that he had "fail[ed] to disclose relevant information [that he] knew or should have known," "appl[ied] a minority discount on the plaintiff's shares," and "commit[ted] a 'freeze-out' of the plaintiff as a minority shareholder . . . ." See generally *Yanow* v. *Teal Industries, Inc.*, 178 Conn. 262, 272 n.6, 422 A.2d 311 (1979) ("a 'freeze-out,' [is] defined broadly as any action by those in control of the corporation which results in the termi-

nation of a stockholder's interest in the enterprise, with the *purpose* of forcing a liquidation or sale of the shareholder's share, not incident to some other wholesome business goal'' (emphasis in original)).

Judge Corradino, in turn, painstakingly examined each and every claim and argument raised by the plaintiff in his posttrial brief. He analyzed the reasons set forth by the plaintiff in his burden shifting argument, and he then shifted the burden to the defendant, and thoroughly analyzed each and every argument briefed by the plaintiff. The plaintiff had argued at various points in his posttrial brief, including in claims other than his breach of fiduciary duty claim, that the defendant had (1) referred to Statewide as a "dinosaur," (2) failed to inform the plaintiff that he could sell his shares to someone other than the defendant, (3) failed to explain the significance of the CAB license, (4) failed to explain Statewide's customer base, (5) failed to inform the plaintiff about the potential sale of Statewide, and (6) failed to tell the plaintiff that he was applying a minority discount to his purchase of the plaintiff's shares and would sell them for more later.

Judge Corradino found that the defendant's use of the word "dinosaur" to describe Statewide was, among other things, not material. See part I A of this opinion. As for the operation of the business, the tax returns showed little income and showed some losses. The record also demonstrates that after Sysco bought Statewide, it closed the old facility and moved to a new, larger facility in Rhode Island. Further, the court concluded that the plaintiff did not rely on that representation because he knew Statewide would have value if sold, and Giglietti had explained to him that Statewide would be worth more if sold later and told him that he should not sell his shares to the defendant.

As for the plaintiff's alleged right to sell to others, we decline to address that argument. See footnote 12 of this opinion.

As for Statewide's CAB license, the court found that the plaintiff was aware of the license and knew it was the "Mercedes Benz" of meat. The evidence also demonstrated that no one knew what the license was worth and that the defendant, Sklarz, and Giglietti all were shocked by the amount Sysco offered to purchase Statewide. In fact, the court stated that "Giglietti and Sklarz were astounded by the fact that Sysco offered $8,000,000 in 2011 to buy Statewide." Additionally, as to the customer list, the plaintiff knew the customers because he had worked at the Statewide facility and was well aware that Statewide had won awards for being part of the "million pound club." The plaintiff had access to Statewide's balance sheet for 2008, and he had its tax returns going back several years before 2009, which indicated $17 million to $18 million in sales, which, the court specifically found, "could only result

from a strong customer base." He also had access to Giglietti, and the defendant had encouraged him to talk to Giglietti and to get whatever he needed to do any necessary due diligence before selling his shares.

As for the defendant's alleged knowledge in 2009 of a potential sale of Statewide, the plaintiff had known since at least 2005 that the defendant wanted to sell the company. This was not a secret. The plaintiff also knew from Giglietti that a sale could generate more value for him than if he sold to the defendant in 2009, and that Giglietti, his accountant and the accountant for Statewide, opined that he should not sell his shares to the defendant. Furthermore, in 2009, when the defendant offered to purchase the plaintiff's shares, there were no pending offers on the table to purchase Statewide. An initial inquiry came a year later and the astonishing offer from Sysco came months after that. There was no evidence that the defendant had any basis to expect such an offer at the time he purchased the plaintiff's shares. On the related issue of purchasing the plaintiff's shares at a minority discount with the intention of selling them for a higher price later, we have addressed this more fully in part I B of this opinion. Overall, the trial court made several subordinate findings of fact to support its ultimate finding that the defendant proved by clear and convincing evidence that he did not act unfairly when he purchased the plaintiff's shares. Importantly, the plaintiff has not challenged any of those subordinate findings, and they are all amply supported by the evidence.

This is a sad and troubling case because it concerns family, including at least two brothers, the plaintiff and the defendant, who apparently once had a close relationship. After hearing the evidence and considering the claims and arguments of the parties, the court found that the brothers often were at odds with each other, and, in 2009, the plaintiff told the defendant that he wanted to sell his shares of Statewide to the defendant so that he could escape the turmoil and be brothers again with the defendant. The plaintiff also wanted to sell because he was building a new home and needed the money. The defendant agreed to purchase the plaintiff's shares and told him to speak with Giglietti, to obtain whatever he needed, to exercise due diligence, and to come up with a reasonable price. The plaintiff did so, and the parties negotiated a price, with the defendant telling the plaintiff he would revisit the money issue if he sold Statewide for millions. Nearly two years later, the defendant sold Statewide for an astonishing $8 million. When he offered to give the plaintiff another $100,000, the plaintiff felt it was not enough, and he brought this action against the defendant. The trial court determined that the plaintiff's claims failed on their merits. The plaintiff, on appeal, has not established that the court was wrong. On the basis of the foregoing analysis, we conclude that the court's finding that the

defendant proved, by clear and convincing evidence, fair dealing and full disclosure in his purchase of the plaintiff's minority shares of stock was not clearly erroneous.

## II

### THE DEFENDANT'S CROSS APPEAL

The defendant claims in his cross appeal that the court improperly rendered judgment in favor of the plaintiff on the defendant's counterclaim seeking attorney's fees pursuant to the certificate of satisfaction signed by the plaintiff when he transferred his shares to the defendant. He argues that, "[a]t the time the parties executed the contract for [the] defendant's purchase of [the] plaintiff's shares, [the] plaintiff signed a 'certificate of satisfaction, representations and warranties and indemnification regarding shares of stock' (certificate), in which he agreed to 'hold harmless and protect the purchaser from and against any claim of any party with respect to such shares,' " and that the court, therefore, erred in refusing to award attorney's fees. The plaintiff argues in relevant part that the plain language of the certificate applies only to third-party claims and does not include attorney's fees.[15] We conclude that the certificate does not apply in the present case.

We begin with our standard of review. "[W]here there is definitive contract language . . . the determination of what the parties intended by their contractual commitments is a question of law. . . . It is implicit in this rule that the determination as to whether contractual language is plain and unambiguous is itself a question of law subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Cruz* v. *Visual Perceptions*, *LLC*, 311 Conn. 93, 101–102, 84 A.3d 828 (2014).

"[I]n reviewing a claim that attorney's fees are authorized by contract, we apply the well established principle that [a] contract must be construed to effectuate the intent of the parties, which is determined from [its] language . . . interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the [writing]." (Citation omitted; internal quotation marks omitted.) *Heyman Associates No. 5*, *L.P.* v. *FelCor TRS Guarantor*, *L.P.*, 153 Conn. App. 387, 415, 102 A.3d 87, cert. denied, 315 Conn. 901, 104 A.3d 106 (2014).

In the present case, the certificate provided in relevant part: "[The plaintiff] was the sole and exclusive owner of [his] [s]hares, had the absolute right, power and authority to sell, transfer, assign and convey such

[s]hares to the [defendant], that the [s]hares were not subject to any pledge, mortgage, lien, security interest, option, right of first refusal, restriction, contract or encumbrance of any kind or manner with respect to the sale, transfer, assignment and conveyance of [s]hares to the [defendant], and the [plaintiff] will warrant and defend such interest, title and right to such [s]hares and hold harmless and protect the [defendant] from and against any claim of any party with respect to such [s]hares."

We conclude that the language is clear and unambiguous. We further conclude that, pursuant to the plain language of the certificate, it does not apply in the present case. In the certificate, the plaintiff agreed that he was the sole and exclusive owner of his shares, that they were unencumbered, and that he had the absolute right to sell them to the defendant. Additionally, the plaintiff agreed and warranted that he would "*defend such interest, title and right to such shares*"; (emphasis added); and hold the defendant harmless and protected from and against any claim made with respect to such shares. Read in its entirety, this language clearly sets forth the plaintiff's obligation to defend *his* interest and rights in the shares from claims made by third parties to those shares, and to hold the defendant harmless and to protect him from such third-party claims. Consequently, we conclude that the plaintiff properly characterizes the certificate as applicable only to a third-party claim challenging the plaintiff's unencumbered interest, title, and right to his shares and his absolute right to sell his shares to the defendant. Accordingly, it is inapplicable to the present case.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Matthew Giglietti, the certified public accountant for Statewide, testified that the defendant ran Statewide, which was "an $18 million company, and [that] it [was] not an easy company. Meat companies by their very nature are not easy companies. [The defendant] was a one man show. He . . . was involved with sales. He did most, if not all, of the purchasing. The biggest problem with the business is collecting your money. When you're dealing with restaurants and country clubs, if you're not on top of that . . . you could be in big trouble in a big hurry, so . . . he was relentless in collecting money for the business. So, he had all the headaches [of] operating an $18 million business . . . ."

[2] The plaintiff testified that he previously had thought about selling his shares because of the family turmoil, as well.

[3] Giglietti testified that he had been the accountant for Statewide since approximately 1985, and that, while working in that capacity, he did Statewide's "corporate tax returns, [the] payroll . . . and [provided] tax advice . . . ."

[4] Giglietti testified that the defendant was the person responsible for acquiring the CAB license, with the hope that it would enhance Statewide's business. The defendant testified that he acquired the CAB license in 1994, after initially having been rejected in 1993.

[5] The court specifically found that "there was some sort of understanding between the parties that if Statewide were to be sold, the plaintiff might receive extra money, but there was no understanding of how much additional money the defendant would give the plaintiff . . . ."

[6] Apparently, the plaintiff had lost his stock certificates.

[7] The court specifically stated that it "[could not] conclude [that] the $50,000 given to the plaintiff by the defendant was part and parcel of an understanding between both of them that it would be part of the sale price for the plaintiff's shares."

[8] The defendant explained: "[T]he actual deal was $6 million and there was a $2 million earn-out that I had to earn over the next two years. I had to continue with the level of sales. . . . If I hit the sales, they would give me $1 million, one of the $2 million. I successfully was able to get the $2 million."

[9] The court noted that Sklarz testified that there had been no offers to buy Statewide in 2009 or 2010. The court also found that "[n]o evidence was offered to show the defendant knew that a deal to buy Statewide was imminent" at the time he bought the plaintiff's shares, and that "Giglietti and Sklarz were astounded by the fact that Sysco offered $8 million in 2011 to buy Statewide."

[10] In its memorandum of decision, the court noted that, in the plaintiff's posttrial brief, his "breach of fiduciary duty claim overlaps, legally and factually [with his] fraudulent nondisclosure, fraudulent misrepresentation, and negligent misrepresentation claims." The court found in favor of the defendant on each of these causes of action. The plaintiff appeals only from the court's judgment on his cause of action for breach of fiduciary duty.

[11] The court explained the family situation as follows: "A tense family situation existed for years, they had not celebrated a holiday together since 1996. A letter was written by the plaintiff . . . to his brothers Richard and Steven in 2000 . . . . The letter tells of bitter family disputes and attitudes that interestingly have nothing to do with the operation of Statewide which is not even mentioned. At one point, after discussing his desire that they all should be acting like brothers and go to a concert together, [the plaintiff] says about all his complaints: 'Stephen, I know this doesn't apply to you as much as it does to Richard considering you've been attempting to make some kind of progress in this whole matter.' "

[12] The plaintiff also argues that the defendant failed to disclose that the plaintiff could sell his shares to someone other than the defendant. The trial court did not address the import, if any, of the defendant *not remembering* whether he told the plaintiff that he might be able to sell his shares to someone else. A review of the plaintiff's posttrial brief reveals that the plaintiff included the following statement in his dissertation of the facts: "Nor does the defendant recall ever informing the plaintiff that since the defendant was not willing to pay four-fifty that he could sell them to Statewide or Richard [Falcigno] and if they did not want to pay four-fifty he could go sell them to anyone else. . . . That said, however, the defendant admitted 'I know he had the opportunity to do that.' " (Citation omitted.) The plaintiff did not raise this again in the entirety of his posttrial brief, nor did he analyze it in any way. Accordingly, the trial court did not mention it in its memorandum of decision. On the basis of the foregoing, we will not consider this argument in our analysis except to say that there is no evidence in the record that anyone other than the defendant was interested in purchasing the plaintiff's minority shares or what someone would have offered had there been an interest.

[13] The plaintiff testified that he was aware that Statewide had a CAB license and that such a license was for "a higher end selected meat. It's just kind of the Mercedes Benz of . . . steaks or meat."

[14] In regard to the plaintiff's argument on appeal that the defendant failed to prove fair dealing because he created an ambiguity regarding the terms of the stock purchase by telling him that he would "cut [him] back in" if Statewide later sold for millions, the plaintiff did not make such an argument in his posttrial brief to the trial court, nor in the breach of fiduciary duty count of his complaint. As a matter of fact, the plaintiff argued in his posttrial brief that the "cut you back in" or revisit language was part of the parties' contract or that it formed its own "definite and certain . . . binding contract," and that it was clear and unambiguous. The trial court determined that this statement did not form a contract, but the language was not ambiguous, i.e., the plaintiff knew that it meant that the defendant would consider giving the plaintiff some additional money if he received millions for Statewide once he found a buyer. Accordingly, we decline to consider this argument on appeal.

[15] We note that the plaintiff, in his posttrial brief to the trial court, did not make the argument that the certificate applied only to third-party claims. Rather, he argued in relevant part that because the certificate did not specify that attorney's fees were included, the American rule would bar such an

award. Because the parties have fully discussed this issue in their respective appellate briefs, and because we conclude that the interpretation of the certificate is a matter of law in this case, the argument of the parties in the trial court is not controlling.

———————————————————